Linda C. CARL, Appellant,

v.

CHILDREN'S HOSPITAL, Appellee.

No. 93–CV–1476.

District of Columbia Court of Appeals.

Reargued En Banc Oct. 12, 1995.

Decided Sept. 23, 1997.

Michael B. Waitzkin, Washington, DC, with whom Stacy A. Feuer, New York City, and Stephen H. Marcus, Washington, DC, were on the brief, for appellant.

J. Patrick Hickey, with whom Paul F. Mickey, Jr., Teresa L. Diaz, and Leslie Stout Tabackman, Washington, DC, were on the brief, for appellee.

Barbara J. Sapin, Washington, DC, and Susan E. Scheider, filed a brief for amici curiae, American Nurses Association and District of Columbia Nurses Association.

Tresa Schlecht, Annandale, VA, and Barbara E. Hirsch, Columbia, MD, filed a brief for amicus curiae, the Capital Area Network of Nurse–Attorneys, Inc.

Before WAGNER, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, FARRELL, KING, RUIZ and REID, Associate Judges, and MACK, Senior Judge.

PER CURIAM:

We granted appellant's petition for rehearing en banc to consider her contention that the narrow public policy exception to the employment-at-will doctrine which we first recognized in *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C.1991), should be expanded to include the rights of employees to speak out publicly on issues affecting the public interest without fear of retaliation by their employers. The division that initially heard this appeal affirmed the trial court's denial of relief because it was bound by precedent to do so. *Carl v. Children's Hospital*, 657 A.2d 286, 289 (D.C.1995), citing *Gray v. Citizens Bank*, 602 A.2d 1096, 1097 (D.C.) ("a division of [this] court is not free to expand the *Adams* exception"), *vacated, id.*

at 1102, *opinion reinstated on denial of rehearing en banc,* 609 A.2d 1143 (D.C.1992); *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971). A majority of the en banc court now agrees with Ms. Carl that *Adams* does not foreclose any additional "public policy" exceptions to the general rule that employment contracts are always at will unless they expressly provide otherwise.

We hold that the "very narrow exception" created in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition. We think Judge Schwelb, in his concurring opinion in *Gray v. Citizens Bank,* read *Adams* correctly: "We could not and did not hold in *Adams* that this was the *only* public policy exception, because that question was simply not presented." *Gray, supra,* 602 A.2d at 1098 (Schwelb, J., concurring). *Adams* simply said that there is "*a* very narrow exception to the at-will doctrine," 597 A.2d at 34 (emphasis added), not "just one and only one" such exception. There is nothing in the *Adams* opinion that bars this court—either a three-judge panel or the court en banc—from recognizing some other public policy exception when circumstances warrant such recognition. On this point a majority of the en banc court agrees. To the extent that *Gray v. Citizens Bank* holds differently, it is overruled.

I

From October 1991 until she was fired in March 1992, Linda Carl was employed as a part-time nurse in the Neonatal Intensive Care Unit ("NICU") of Children's Hospital. Shortly thereafter, Ms. Carl filed this suit against the hospital and Cathy Fonner, a nurse employed by the hospital as a clinical educator, alleging that she had been discharged because of her advocacy for patients' rights before the legislature and the courts. Ms. Carl claimed specifically that she was fired because she had testified before the Council of the District of Columbia on proposed tort reform legislation, taking a position contrary to the interests of her employer,[1] and because she had appeared in court as an expert witness for plaintiffs in medical malpractice cases. She sought recovery on six separate theories: wrongful discharge, promissory estoppel, defamation, intentional infliction of emotional distress, breach of contract, and intentional interference with contractual relations. With respect to the wrongful discharge claim, Ms. Carl asserted that her termination contravened specific public policies recognized in the District of Columbia. This court's prior decision summarized these claimed policies as follows:

(1) a citizen's right to engage in political expression before the Council without fear of harassment or intimidation;[2] (2) a professional nurse's duty to participate in the legislative process, to advocate positions of public importance on behalf of patients, and to educate the legislature so that it can make informed public policy decisions;[3] and (3) the evidentiary rule requiring expert testimony to establish a prima facie case of negligence in a medical malpractice action.[4]

---

1. The proposed legislation against which Ms. Carl testified would have limited the recovery of damages in medical malpractice cases, thereby benefiting hospitals in the District of Columbia.

2. Ms. Carl contends that this policy is clearly embodied in D.C.Code § 1–224 (1992), which provides in part:

Whoever, corruptly or by threat of force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before the Council, or in connection with any inquiry or investigation being had by the Council, or any committee of the Council, or any joint committee of the Council; or whoever injures any party or witness in his person or property on account of his attending or having attended

such proceeding, inquiry, or investigation, or on account of his testifying or having testified to any matter pending therein ... shall be fined not more than $2,000 or imprisoned not more than 2 years, or both.

3. "This policy is supposedly grounded in the District of Columbia Health Occupations Act, D.C.Code § 2–3301.2(17)(C) (1981), defining the practice of registered nursing; and the national nursing code of conduct, CODE FOR NURSES WITH INTERPRETIVE STATEMENTS § 11.2 (1985)." *Carl I, supra,* 657 A.2d at 288 n. 3.

4. To support this proposition, Ms. Carl cites *Washington v. Washington Hospital Center,* 579 A.2d 177, 181 (D.C.1990); *Eibl v. Kogan,* 494 A.2d 640, 642 (D.C.1985); *Gordon v. Neviaser,*

*Carl v. Children's Hospital,* 657 A.2d 286, 288 (hereafter *"Carl I "*), *vacated on grant of rehearing en banc,* 665 A.2d 650 (D.C.1995).

The hospital moved under Super. Ct. Civ. R. 12(b)(6) to dismiss Ms. Carl's complaint for failure to state a claim upon which relief could be granted. In its motion, the hospital defended its decision to fire Ms. Carl on the ground that she was originally hired as a probationary employee and that, as such, "she was required to complete the NICU orientation program, which consisted of both clinical and classroom components, in order to be fully qualified to care for the infants in the unit, and to work a minimum of twenty hours per week." *Carl I,* 657 A.2d at 287. According to the hospital, Ms. Carl never completed her orientation classes,[5] and she consistently failed to meet her weekly twenty-hour quota. Hospital personnel held at least three meetings with Ms. Carl in February 1992 to discuss her employment status. Citing her failure to meet the orientation requirements, the hospital fired her on March 20, 1992.

Ms. Carl alleged, on the other hand, that she was not a probationary employee, that she requested to defer orientation only once, and that she met her minimum work requirements as scheduled by her supervisor, who made the assignments on a weekly basis. Since the trial court dismissed Ms. Carl's complaint under Rule 12(b)(6), we must construe the complaint in the light most favorable to her and must take her allegations as true. *See, e.g., McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C.1979).

The trial court, after a hearing, granted the hospital's motion to dismiss Ms. Carl's

478 A.2d 292, 295 (D.C.1984); and *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 368 (D.C.1980).

5. The hospital asserted that Ms. Carl requested, and was granted, permission to defer two of her orientation classes, but that they were never made up.

6. Along with Ms. Carl's wrongful discharge claim, the court also dismissed at the same time her defamation and emotional distress claims. It ruled, however, that she had sufficiently stated claims for promissory estoppel, breach of contract, and interference with contractual relations. The parties then began the discovery process, and in the course of discovery the court denied

wrongful discharge claim. Apparently relying on *Adams v. George W. Cochran & Co., supra,* the court said:

> I really don't think there's much dispute about what the law is here.... [T]hat's a claim that only lies if there's a dismissal based on the refusal to perform an illegal act. And I don't think that's what we [have] here....

After further proceedings related mainly to discovery, Ms. Carl voluntarily dismissed her remaining claims so as to put her case in an appealable posture.[6] Her appeal was briefed and argued before a division of this court, which affirmed the dismissal of her wrongful discharge claim and found no abuse of discretion in the denial of her motion to compel discovery. *Carl I, supra.* She petitioned for rehearing en banc on the wrongful discharge claim, which we granted in *Carl v. Children's Hospital,* 665 A.2d 650 (D.C.1995).[7]

## II

On the merits of the controversy between the parties, a majority of the court concludes that Ms. Carl's complaint was dismissed in error and should be reinstated. The judgment of the trial court is therefore reversed, and the case is remanded for such further proceedings as may be appropriate.

*Reversed and remanded.*

TERRY, Associate Judge, with whom Chief Judge WAGNER and Associate Judges FARRELL and RUIZ join, concurring:

I agree with the majority that *Adams v. George W. Cochran & Co.,* 597 A.2d 28 (D.C.

Ms. Carl's motion to compel the production of certain documents. Thereafter the intentional interference claim was dismissed by stipulation, without prejudice as to the hospital and with prejudice as to co-defendant Fonner. Ms. Carl voluntarily dismissed the remainder of her complaint in order to seek appellate review of the denial of the motion to compel discovery and the dismissal of the wrongful discharge claim.

7. Ms. Carl did not seek rehearing on the discovery issue, and this opinion does not address it. We leave it to the trial court, on remand, to decide whether its discovery ruling should be reconsidered in light of our decision in this appeal.

1991), does not bar this court from recognizing exceptions to the at-will doctrine in addition to the one adopted in *Adams.* However, lest we allow "public policy" exceptions to swallow up the at-will doctrine, I would also hold that the recognition of any such exception must be firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular "public policy" being relied upon. Applying this standard to the case before us, I conclude that Ms. Carl has made a sufficient showing to justify a public policy exception here.

## I

### A. *Ms. Carl's contentions*

■ In deference to our previous wrongful discharge cases, Ms. Carl does not seek to invoke the "very narrow exception" to the at-will doctrine that we articulated in *Adams.* She concedes that her case does not fall within this exception. Ms. Carl also does not contend that the hospital's alleged retaliatory firing of her was conduct prohibited by D.C.Code § 1–224. Instead, she reiterates the argument she made before the division "that the statute embodies a broader legislative disapproval of any acts that punish an individual for testifying before the Council." *Carl I,* 657 A.2d at 289 n. 5. Thus she now invites the en banc court, as she invited the division, "to expand *Adams* to encompass a claim such as the one alleged by her, arguing that [section 1–224], the national nursing code, and District of Columbia case law set forth clear public policy, the violation of which creates a wrongful discharge cause of action." *Id.* at 289. For the reasons that follow, I agree with Ms. Carl with respect to

her reliance upon section 1–224, but I reject her other arguments.

### B. *The proper standard for a public policy exception*

This court has long and consistently adhered to the rule that employment is presumed to be at will, unless the contract of employment expressly provides otherwise. Thus "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co., supra,* 597 A.2d at 30 (citing cases);[1] *see, e.g., Thigpen v. Greenpeace, Inc.,* 657 A.2d 770, 771 (D.C.1995); *Taylor v. Greenway Restaurant, Inc.,* 173 A.2d 211, 211 (D.C.Mun.1961); *Pfeffer v. Ernst,* 82 A.2d 763, 764 (D.C.Mun.1951). In *Adams* we reiterated our commitment to this principle, but created a "very narrow exception"

> under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation.[2]

597 A.2d at 32 (citations omitted).[3]

In *Sorrells v. Garfinckel's, supra* note 3, a pre-*Adams* opinion, this court had turned down another plea to carve out a public policy exception to the at-will doctrine. We also observed that even if we had been so inclined, there was no "statutorily declared public policy" to support that particular plaintiff's wrongful discharge claim. *Sorrells,* 565 A.2d at 289 (citing *Ivy v. Army Times Publishing Co.,* 428 A.2d 831, 833 (D.C.1981) (Ferren, J., dissenting)). We rejected a request "to 'broaden' the policies expressed in [a certain statute] and to fill a

1. This principle is subject, of course, to the caveat that an employer may not discharge an employee for a reason that has been made unlawful by a statute specifically applicable to the employer-employee relationship—for example, a statute prohibiting discriminatory practices in employment, such as the District of Columbia Human Rights Act, D.C.Code § 1–2512 (1997 Supp.).

2. The discharged employee in *Adams,* a delivery truck driver, had refused to drive a truck that did not have an inspection sticker on its windshield, as required by a municipal regulation. We allowed the employee to maintain his action be-

cause it was "unacceptable and unlawful for his employer to compel him to choose between breaking the law and keeping his job." 597 A.2d at 34.

3. Prior to *Adams,* this court had rejected several attempts to create a broad "public policy" exception to the general rule of at-will employment. *See, e.g., Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285, 289 (D.C. 1989); *Ivy v. Army Times Publishing Co.,* 428 A.2d 831 (D.C.1981) (denying petition for rehearing en banc).

perceived 'gap' in the [statute]," 565 A.2d at 289, choosing instead to limit ourselves to ascertaining whether any specific statutory right of the plaintiff had been infringed. *Adams* likewise limits its focus to an "identifiable" or "officially declared" public policy in considering whether to recognize a public policy exception. 597 A.2d at 34.

I would hold that the recognition of any public policy exception to the at-will doctrine must be solidly based on a statute or regulation that reflects the particular public policy to be applied, or (if appropriate) on a constitutional provision concretely applicable to the defendant's conduct.[4] This is consistent with *Sorrells* and *Adams,* read together. *See also Gantt v. Sentry Insurance,* 1 Cal.4th 1083, 1095, 824 P.2d 680, 687–688, 4 Cal.Rptr.2d 874, 881–882 (1992). To hold otherwise would reduce the at-will doctrine to a virtual nullity, for it would leave this court (and the trial court as well) without any standard by which to assess the so-called policy being urged upon us in a given case.

I am aware that other courts have adopted public policy exceptions that are more expansive and based on broader foundations than ours. *See Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 106 & n. 3 (Colo.1992) (noting thirty-seven jurisdictions with some sort of public policy exception to the at-will doctrine). One court, for example, has defined "public policy" as "that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.Ct.App.1985). But this definition illustrates just how nebulous the concept of public policy can be. What court can, with any reasonable degree of certainty, identify "the public good" or decide just what is "injurious to the public"? One person's notion of public injury may well be another person's societal good. Indeed,

the very notion of "public policy" is often vague and exists primarily in the eye of the beholder. In general, I believe that courts should refrain from trying to determine or articulate public policy. Unless the issue to be decided directly affects the administration of justice or the judicial process, or the application of established legal principles, courts should generally abstain from making declarations of public policy. Such pronouncements should be left to the other branches of government, particularly the legislature, which is in a far better position than a court to make policy decisions on behalf of the citizenry.

The common law that the courts of the District of Columbia have developed over the years is that employment is at will unless a contract or a statute provides otherwise, or unless there is a "public policy" exception. This case does not alter that basic legal framework; it presents only the question whether Ms. Carl's situation involves a proper public policy exception. I do not question the judicial power to "revis[e] and enlarg[e] the common law ... to meet the changes of a dynamic society,"[5] and to look to prior decisions for guidance in recognizing and enforcing some policy that has already been established by the executive or legislative branch of the government. Indeed, judges throughout the land do exactly that on a daily basis. Where I disagree with some of my colleagues is over the suggestion that a judge or group of judges may create public policy and then enforce it. I am unwilling to accept the notion that a court can or should go that far, for policy-making is not part of the "usual judicial function." *Linkins, supra* note 5, 87 U.S.App. D.C. at 355, 187 F.2d at 361.

Judge Ferren's separate opinion, although primarily addressed to Judge Steadman's dissent, appears to find an inconsistency between my view of the general advisability of

---

4. I leave open whether, in an unusual case, where the legislature has not yet had occasion to address by law or regulation a substantial danger to public health or public safety, termination of an employee for reporting such danger to public authorities would be actionable. Ms. Carl's decision to speak out publicly on general issues relating to public health, specifically tort reform, certainly does not rise to that level.

5. *Linkins v. Protestant Episcopal Cathedral Foundation,* 87 U.S.App.D.C. 351, 355, 187 F.2d 357, 361 (1950) (common law "should not be followed where changes in conditions have made it obsolete"; court "never hesitated to exercise the usual judicial function of revising and enlarging the common law"). *See also Kay v. Cain,* 81 U.S.App.D.C. 24, 25, 154 F.2d 305, 306 (1946).

abstention by the courts from declaring public policy and this court's decision in *Williams v. Baker*, 572 A.2d 1062 (D.C.1990) (en banc). In *Williams*, however, while we recognized that the issue presented there (whether, and to what extent, a plaintiff can recover tort damages for fear of harm to a third person) was "a question of policy for the court" to decide, *id.* at 1072, we were referring to "policy" in the sense of "the framework of traditional and accepted negligence principles," *id.* at 1073 (citation omitted). Within that framework we modestly expanded the scope of recovery for the tort of negligent infliction of emotional distress. That is very different from a court's undertaking in every case of claimed wrongful discharge to "balance the interests of the employee, the employer, and the public," *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 71, 417 A.2d 505, 511 (1980), and decide for itself the proper "public policy" outcome of the dispute. In this regard we are mindful of what the Supreme Court of California has said:

> "[P]ublic policy" as a concept is notoriously resistant to precise definition, and [therefore] courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law."

\* \* \* \* \*

... [C]ourts *in wrongful discharge actions* may not declare public policy without a basis in either the constitution or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees, and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded.

*Gantt v. Sentry Insurance, supra*, 1 Cal.4th at 1095, 824 P.2d at 687–688, 4 Cal.Rptr.2d at 881–882 (citations omitted; emphasis in original). Like the court in *Gantt*, this court in the past has sought to make sure that any judicially recognized public policy exception to the at-will doctrine is "carefully tethered"[6] to rights officially recognized in statutes or regulations by the elected representatives of the people—the "public" whose policy we are talking about.

Future requests to recognize such exceptions, therefore, should be addressed only on a case-by-case basis. This court should consider seriously only those arguments that reflect a clear mandate of public policy—*i.e.*, those that make a clear showing, based on some identifiable policy that has been "officially declared"[7] in a statute or municipal regulation, or in the Constitution, that a new exception is needed. Furthermore, there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination.[8]

## II

Ms. Carl maintains that D.C.Code § 1–224 embodies just such a policy as I have been

---

6. At various places in this opinion, I have used such phrases as "carefully tethered," "firmly anchored," and "solidly based" to describe the relationship between the particular public policy at issue and the statute or regulation from which I believe it should be derived. To avoid any uncertainty about the meaning of these terms, the reader should know that I use them interchangeably and regard them as synonymous with one another.

7. This phrase comes from *Adams*, 597 A.2d at 33. In *Sorrells* we spoke only of a "statutorily de-

clared public policy," 565 A.2d at 289 (citing Judge Ferren's dissent in *Ivy v. Army Times*, 428 A.2d at 833). *Adams* expanded this concept, however, to include not only statutes but municipal regulations which have the force and effect of law. *See* 597 A.2d at 33 n. 8.

8. For these reasons, I would reject Ms. Carl's attempt to glean a public policy exception from a rule of evidence and other sources related to expert testimony in medical malpractice actions.

talking about, namely, the promotion and protection of every citizen's right to testify before the legislature. Section 1–224, quoted in footnote 2 of the Per Curiam opinion, *ante* at 160, prohibits any endeavor "to influence, intimidate, or impede any witness in any proceeding before the Council" and specifies the prohibited means: "corruptly or by threat of force, or by any threatening letter or communication." The statute also makes it a crime to "injure[ ] any ... witness in [her] person or property ... on account of [her] testifying or having testified to any matter pending" before the Council. Although the alleged firing of Ms. Carl by Children's Hospital because she testified before the Council—an allegation which we must accept as true for the purposes of a Rule 12(b)(6) motion to dismiss—is not expressly prohibited by section 1–224, Ms. Carl contends that it fits within the scope of the public policy expressed in the statutory prohibition against "injur[ing] a witness in [her] person or property" because of that witness' testimony.

This court has not had occasion to interpret D.C.Code § 1–224, nor is it called upon to do so here. In particular, we need not conclude—and would be hard-pressed to conclude—that Children's Hospital violated this criminal statute when it fired Ms. Carl. Rather, in determining whether a public policy exception to the at-will doctrine applies to this case, we need only decide whether the alleged firing because Ms. Carl testified before the Council is sufficiently within the scope of the policy embodied in the statute so that a court may consider imposing liability on Children's Hospital for Ms. Carl's termination for otherwise permissible reasons. Although the question is not an easy one to answer, I think the statute speaks with sufficient clarity to entitle Ms. Carl to proceed beyond a motion to dismiss her complaint under Rule 12(b)(6). In the context of this case, I read section 1–224 as a declaration of policy by the Council seeking to ensure the availability of information essential to its legislative function by imposing criminal penalties on anyone who seeks to impede Council access to such information.

A couple of examples may clarify application of the statutory policy in the employer-employee context. It seems clear enough that, under section 1–224, an employer could not slash the tires of an employee's car in retaliation for that employee's testifying before the Council. Nor could the employer send a letter threatening to do so as a way of frightening the employee into not giving testimony. Such thuggery, however, is not likely to be the manner in which an employer would choose to impede or injure an employee whom it does not want to testify before the Council. An employer's most effective power to injure an employee arises from the employment relationship itself. There are many actions that an employer could take against an employee which conceivably could "influence, intimidate, or impede" that employee's testimony before the Council. But the most severe and most effective one—the one that would inflict the greatest injury on the person or property of the employee—is the termination of employment. That is the injury that Ms. Carl has alleged. Given the intent of the Council in section 1–224 to shield persons who testify before it from retaliation against their person or property interests, I think she is entitled to prove that injury if she can, and therefore the dismissal of her complaint should be reversed.[9]

9. I am not persuaded by Ms. Carl's other two arguments. First, she relies on D.C.Code § 2–3301.2(17)(C) (1994), a small part of a much larger statute regulating "health occupations" in general. This provision simply defines the term "practice of registered nursing" as it is used in the larger statute, outlining some of the areas in which a registered nurse's specialized knowledge may be applied. It offers no declaration of policy of the sort needed to support a public policy exception to the at-will doctrine.

Ms. Carl also relies on section 11.2 of the CODE FOR NURSES WITH INTERPRETIVE STATEMENTS (1985), promulgated by the American Nursing Association, which directs nurses to "promote the welfare and safety of all people" through "active participation in decision-making in institutional and political arenas." While there may be some professional codes of ethics, such as this court's Rules of Professional Conduct for members of its bar, that could be regarded as a possible source of public policy because they have been adopted under the court's authority to regulate lawyer conduct, *see* D.C.Code § 11–2501(a) (1995)—a matter that need not be decided here—the CODE FOR NURSES is not in that category. I agree with

FERREN, Associate Judge, with whom MACK, Senior Judge, joins, concurring:

I join the per curiam opinion. I join Judge TERRY's Part IA. (except for the last clause rejecting Ms. Carl's "other arguments"). I also join Judge TERRY's Part II (except for footnote 9 rejecting "Ms. Carl's other two arguments"). In addition, I join Judge SCHWELB's and Judge MACK's opinions (including Judge MACK's dissent at division in *Carl v. Children's Hospital,* 657 A.2d 286 (D.C.1995)), which elaborate very ably why the public policy exception to the at-will employment doctrine applies more broadly than Judge TERRY would have it in Part IB. of his opinion.

I write separately to address the dissenting opinion of Judge STEADMAN calling upon critics of the at-will doctrine to address their concerns not to this court but exclusively to the legislature, "the body that is ... manifestly better positioned to make such determinations." *Post* at 196. I believe that Judge STEADMAN ignores the traditional, continuing responsibility of the courts to keep shaping the common law in response to evolving cultural norms, as applied to changing social and economic circumstances.

I.

A.

Judge STEADMAN would require that "public policy exceptions to the at-will employment doctrine be fashioned exclusively by the legislature" because, first, "the legislature is the proper organ of government to make and define the scope of public policy." *Post* at

197. He is half right—and thus half wrong. The courts as well as the legislature unquestionably—and legitimately—make public policy every day; "it is indisputable that our legal system assigns to courts a creative role in improving law." [1] Indeed, "[a] tradition of law improvement by creative judicial action has been part of the common law system from a point as near its beginnings as a custom can be said to have become tradition." [2]

This court sitting en banc has noted that, at the time of Blackstone, "adjudication consisted of a search for the right or true rules of law [i]n accordance with the thesis that they always had been the law." [3] Because judges accordingly "found" the law, they could not be said to have "made" law. Later, the positivist school represented by John Austin "conceived of judges not as mere discoverers but as active creators of the law." [4] In overruling precedent, therefore, judges in Austin's eyes did not merely discover error, as Blackstone would have it; they participated, rather, in "the dynamic process of redefinition and reformation that advanced the evolution of the law." [5] This latter view is the more realistic one. Common law judges from time to time do "make" law, however incrementally; indeed, they always have done so.

In this jurisdiction, for example, the United States Court of Appeals for the District of Columbia abolished common law charitable immunity, allowing a nurse acting in the course of duty, to recover damages from her nonprofit hospital employer for injuries caused when another hospital employee violently—and thus negligently—pushed a

---

the New Jersey court in *Warthen v. Toms River Community Memorial Hospital,* 199 N.J.Super. 18, 28, 488 A.2d 229, 234, *cert. denied,* 101 N.J. 255, 501 A.2d 926 (1985), which concluded "as a matter of law" that "the ethical considerations [set forth in the CODE FOR NURSES] ... do not rise to the level of a public policy mandate". *See also Wright v. Shriners Hospital for Crippled Children,* 412 Mass. 469, 473, 589 N.E.2d 1241, 1244 (1992) ("We would hesitate to declare that the ethical code of a private professional organization can be a source of recognized public policy"). Moreover, Ms. Carl does not claim that the hospital fired her for refusing to violate the CODE FOR NURSES, nor does she contend that it would have been an ethical violation for her, as a voluntary witness, to refrain from advocating

publicly a position contrary to her employer's interests. I can find no basis in the CODE FOR NURSES for Ms. Carl's public policy claim.

1. ROBERT E. KEETON, VENTURING TO DO JUSTICE 11 (1969).

2. *Id.* at 13.

3. *Mendes v. Johnson,* 389 A.2d 781, 787 (D.C. 1978) (en banc).

4. *Id.*

5. *Id.*

swinging door into her.[6] Later, that court declared a furniture store installment sale contract unenforceable because its terms were "unconscionable"—a clear declaration and application of public policy, by judges, to protect consumers against a retailer's over-reaching.[7] In doing so, the federal court was exercising its discretionary appellate authority at the time to overrule this court, which had held that the consumer should look not to the courts but to Congress for relief.[8] A few years later, in an expansive act of statutory interpretation, the same federal court ruled that a landlord could not lawfully retaliate by evicting, on the usual thirty days' notice, a month-to-month tenant who had reported housing code violations on the premises, despite the absence of any provision in the housing law that could be read as expressly prohibiting retaliatory eviction.[9] Again, the court overruled this court, which had seen no such provision and said: "If, as some believe, the law relating to landlords and tenants is outdated, it should be brought up to date by legislation and not by court edict." [10]

This court had not always declined to advance the law where the public lacked adequate protection. In 1962, for example, in a products liability suit for breach of implied warranty, we eliminated the common law privity requirement which had prevented users of defective products from suing the manufacturers.[11] Noting that "[m]ethods of commerce have drastically changed in the twentieth century," we invoked public policy to change the applicable rule of law:

> The policy of protecting the public from injury ... outweighs allegiance to a rule of law which, if observed, might produce great injustice. It is a new obligation attendant upon a new era.... Irrespective of the early rulings in this jurisdiction ... we are convinced that the buying public in the District of Columbia is better protected by eliminating the requirement for contractual privity.... [12]

In 1978, this court again changed the law by extending the basis for manufacturer's liability from breach of implied warranty to strict liability in tort, and from the sale of goods to the sale of newly constructed cooperative homes.[13] Twelve years later, in 1990, this court further expanded the law, changing the rule governing recovery of damages for negligent infliction of emotional distress. Previously, recovery had been limited to cases where the emotional injury flowed from direct physical injury; we rewrote the law, modestly, to allow recovery without physical injury if the plaintiff, in witnessing physical danger to a member of her immediate family, was in a zone of physical danger herself and, as a result, feared for her own safety.[14] Over fifty years earlier in 1939, the federal court of appeals had called the rule we eventually discarded in 1990—barring recovery for " 'mental pain or suffering caused by shock from the accident, not traceable to the physical injuries' "—a rule of law "counter to the whole current of modern authority." [15] At that time, in recognizing a new tort of intentional infliction of emotional distress resulting in physical harm, the court elaborated on its role as law-maker:

> [I]f we are in one of the "open spaces" in the law of this jurisdiction we must fill it as well as we can, with a view to the social

**6.** See President and Directors of Georgetown College v. Hughes, 76 U.S.App. D.C. 123, 130 F.2d 810 (1942) (en banc).

**7.** See Williams v. Walker–Thomas Furniture Co., 121 U.S.App. D.C. 315, 319, 350 F.2d 445, 449 (1965).

**8.** See Williams v. Walker–Thomas Furniture Co., 198 A.2d 914, 916 (D.C.1964).

**9.** Edwards v. Habib, 130 U.S.App. D.C. 126, 397 F.2d 687 (1968).

**10.** Edwards v. Habib, 227 A.2d 388, 392 (D.C. 1967) (footnote omitted).

**11.** See Picker X–Ray Corp. v. General Motors Corp., 185 A.2d 919 (D.C.Mun.1962).

**12.** Id. at 923.

**13.** See Berman v. Watergate West, Inc., 391 A.2d 1351 (D.C.1978).

**14.** See Williams v. Baker, 572 A.2d 1062, 1064 (D.C.1990) (en banc).

**15.** Clark v. Associated Retail Credit Men, 70 App. D.C. 183, 185 n. 6, 105 F.2d 62, 64 n. 6 (1939).

interests which seem to be involved and with such aid as we can get from authorities elsewhere and from "logic, and history, and custom, and utility, and the accepted standards of right conduct." *We cannot evade this duty; for unless we establish a right in the plaintiff we establish a privilege or immunity in the defendant.* The fact that the question is novel in this jurisdiction does not mean that the plaintiff cannot recover.[16]

Judge STEADMAN's deference to the legislature as the exclusive source for law reform through the application of public policy, therefore, is entirely ·out of step with the traditional law-making role the courts of this jurisdiction have long carried out as custodians of an ever-evolving common law. Without doubt, there are two agencies for change in the law that seek to identify and apply sound public policy: the legislature *and* the courts.

### B.

Plainly, employment law falls within the law-making function of the courts, as well as the legislature. Whatever one thinks of the at-will employment doctrine, the praise or blame belongs, historically, to the state courts, which invented it. At English common law, employment for an indefinite duration was presumed to be for a year.[17] In the United States, however, the courts sooner or later adopted the at-will employment doctrine, as articulated in an oft-cited 1877 legal treatise by Horace G. Wood.[18]

There has been a lively debate whether Wood actually created the at-will rule himself or based it on discernible precedent.[19] There also has been controversy over whether the rule had its origins in economic pressures [20] or, more parochially, in the courts' desires to free their dockets of employment cases believed unsuitable for juries to decide.[21] Apparently no one, however, disputes the origins of the at-will doctrine: the courts, not the legislatures.

The mid-nineteenth century codification movement led by David Dudley Field in New York reflected proposed codifications of judge-made employment law, not a fresh legislative initiative focused on developing the best rules; [22] and, to the extent state legislatures adopted the at-will employment rule later in the nineteenth century, they borrowed the approaches adopted earlier by the states' highest courts.[23] This is not to say the legislatures had no proper role in the field, then or now. It is to say that the courts were the first public institutions to get involved in identifying and applying the fundamental norms governing employer-employee relationships.

16. *Id.* at 185, 105 F.2d at 64 (quoting BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 112, 113) (emphasis added) (footnote and additional internal quotation marks omitted).

17. According to Blackstone:
    If the hiring be general, without any particular time limited, the law construes it to be a hiring for a year; upon a principle of natural equity, that the servant shall serve, and the master maintain him, throughout all revolutions of the respective seasons, as well when there is work to be done as when there is not.
    WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 425 (21st ed. 1847).

18. According to Wood:
    With us the rule is inflexible, that a general or indefinite hiring is prima facie a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof.... It is an indefinite hiring and is determinable at the will of either party, and in this respect there is no distinction between domestic and other servants.

HORACE G. WOOD, A TREATISE ON THE LAW OF MASTER AND SERVANT § 134, at 272 (2d Ed. 1877).

19. *Compare* J. Peter Shapiro & James F. Tune, Note, *Implied Contract Rights to Job Security*, 26 Stan.L.Rev. 335, 341 & n. 53–54 (1974) (arguing that none of the cases cited by Wood supported his rule) *with* Andrew P. Morriss, *Exploding Myths: An Empirical and Economic Reassessment of the Rise of Employment At–Will*, 59 Mo. L.Rev. 679, 756–60 (1994) (arguing that Wood was merely restating well-accepted legal principles) *and* Deborah A. Ballam, *Exploding the Original Myth Regarding Employment-at–Will: The True Origins of the Doctrine*, 17 BERKELEY J. EMP. & LAB. L. 91, 130 (1996) (same).

20. *See* Ballam, *supra* note 19, at 125–28.

21. *See* Morriss, *supra* note 19, at 683.

22. *See id.* at 705–06.

23. *See id.*

Obviously, the legislature got busy in the employment field as issues of child labor, industrial safety, minimum wages, and trade unions emerged, although for awhile the Supreme Court used substantive due process to limit what the legislature could do.[24] As the twentieth century unfolded, however, various legislative protections for employees began to survive. In the very term when the Supreme Court protected an employer who had discharged an employee for union activity,[25] the Court was persuaded by attorney Louis D. Brandeis to uphold the constitutionality of an Oregon law limiting women's factory work to ten hours a day.[26]

This is not to say, however, that the courts began to lose their own traditional common law role as the legislature started to protect employees. To the contrary, this court held not long ago in *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30–34 (D.C.1991)—on the basis of a common law "public policy exception"—that an at-will employee has a claim in tort for wrongful discharge if fired because of her refusal to violate a statute or municipal regulation. The en banc court holds today, moreover, that we retain a role in fashioning exceptions to the at-will rule when circumstances dictate change. Judge STEADMAN, however, takes an exceptionally extreme position, basically saying: the legislators over the years have shown enough involvement with employer-employee rights for us to get out of the business and let them take charge of the at-will issue entirely. (Under the logic of his analysis, therefore, we should overrule *Adams* today to permit the Council to decide what happens when an employer fires an employee for a refusal to break the law at the employer's request.)

My purpose here is to show that the dissenting attitude reflects, really, an abdication of the role of common law judges, at least in the employment field. As elaborated below, this court, no less than the Council of the District of Columbia, has a legitimate responsibility for deciding what public policy exceptions to the at-will doctrine should be acknowledged and applied. The Council can override our decisions if it finds them undesirable, but, until the Council does so, our decisions based on public policy are as legitimate in changing the law applicable to at-will employment as any rule of law the Council itself may choose to adopt.

II.

A question immediately suggests itself: are there no limits on the court's law-making authority in the employment field? Appellee Children's Hospital says there are limits and offers mostly a practical, not a normative, response. It argues that the legislature should assume full responsibility for enacting all wrongful discharge law because litigation to establish new legal theories in this field is counter-productive. The hospital says that litigation is too costly; employee wages are therefore suppressed by the employer's need to allocate resources for defense of novel wrongful discharge claims; most suits are brought by ex-employees who belonged to the managerial and professional ranks, not by lower-level workers, so the public overall will not benefit from expanded theories of recovery; litigation requires years before resolution; lawyer enrichment is a principal benefit; wrongful discharge claims where the courts step in breed doctrinal confusion and unpredictability for employer and employee alike; for all these reasons alternative dispute resolution is to be preferred over litigation; and, in any event, legislation is superior to any wrongful discharge rules a court is likely to fashion—in particular, legislation along the lines of the Model Employment Termination Act (META)[27] drafted by the National Conference of Commissioners on Uniform State Laws.

Virtually all these reasons could be applied to any legal field where a claimant asserts common law rights through litigation; appel-

---

**24.** *See, e.g., Adair v. United States*, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) (holding unconstitutional federal statute making it a crime for employer to discharge employee for union membership).

**25.** *See id.*

**26.** *See Muller v. Oregon*, 208 U.S. 412, 28 S.Ct. 324, 52 L.Ed. 551 (1908).

**27.** MODEL EMPLOYMENT TERMINATION ACT, 7A U.L.A. 80–99 (Supp.1997).

lee, fundamentally, is opposed to lawsuits. As to the preference for alternative dispute resolution, it is important to recognize that arbitration, as well as mediation, are as available for common law, as for statutory, claims; in this jurisdiction trial courts are authorized to push such alternatives before trying any civil lawsuit when circumstances suggest they might help.[28]

If we recognize (as we must) that wrongful discharge claims are going to be made, the issue then posed is whether new wrongful discharge law should be made, as appropriate, by common law litigation or only by legislation. I say that both should be available, for two reasons.

First, comprehensive legislation is not necessarily going to provide more equitable results, or less litigation, than individual lawsuits. A Montana statute broadly permitting discharge of employees only for "good cause" is an example of legislation that apparently has resolved very little and, quite obviously, invites litigation.[29] Moreover, adoption of META—even if we assume it to be the most carefully crafted, equitable formulation available—is not going to be a panacea that eliminates, or even necessarily reduces, litigation. Statutes spawn lawsuits, just as the common law does, and the fundamentals of META have been seriously challenged.[30] In sum, no one has established to my satisfaction that we ought simply to abandon our common law responsibility to evaluate wrongful discharge claims on their merits, in favor of waiting for comprehensive legislative treatment that is likely to present its own controversies, its own vortex of litigation, and—of considerable significance—may never come to pass here.

Second, the Council over the years has chosen to treat employment discharge issues on an individual, not a comprehensive, basis much like the court itself deals with particular cases. This not only leaves room for both law-making institutions to act but also reflects a pattern where the Council can be said to have invited the local courts to continue taking their common law initiatives.

Specifically, the Council has enacted legislation to provide administrative and/or judicial remedies against an employer who: fires an employee for serving on jury duty,[31] discharges an employee who seeks worker's compensation benefits for on-the-job injury,[32] lets an employee go for a wide range of discriminatory reasons,[33] discharges an employee for complaining about health and safety violations,[34] fires someone for filing charges against an employer who violates the employee's right to family and medical leave,[35] retaliates against a "whistleblowing" D.C. government employee who discloses to a superior, or to a public body, a violation of law or misuse of government resources,[36] or discriminates against any employee for providing information in connection with an investigation of a potentially improper government contract.[37]

When the Council recently looked at a wrongful discharge issue, it focused exclusively on a very narrow, precisely drawn concern: protection of employees who provide food, janitorial, and nonprofessional health care services. The Council enacted legislation that requires contractors who take over contracts for the provision of such services to hire their predecessors' employees for a period of ninety days and, after evalua-

28. *See* Super. Ct. Civ. Arb. Prog. R. I (providing that all civil cases, with certain enumerated exceptions, may be assigned to non-binding arbitration by judges at any time and without consent of parties); DISTRICT OF COLUMBIA COURTS ANNUAL REPORT (1995), at 54–56 (discussing Alternative Dispute Resolution ("ADR") Program in which Multi-Door Dispute Resolution Division facilitates mediation and conciliation, as well as arbitration).

29. *See* J. Wilson Parker, *At–Will Employment and the Common Law: A Modest Proposal to De–Marginalize Employment Law,* 81 IOWA L. REV. 347, 371–76 (1995).

30. *See id.* at 376–79.

31. *See* D.C.Code § 11–1913(c) (1995 Repl.).

32. *See* D.C.Code § 36–342 (1997 Repl.).

33. *See* D.C.Code §§ 1–2525, –2556 (1992 Repl.).

34. *See* D.C.Code § 36–1217 (1997 Repl.).

35. *See* D.C.Code §§ 36–1307, –1310 (1997 Repl.).

36. *See* D.C.Code § 1–616.3 (1992 Repl.).

37. *See* D.C.Code § 1–1188.10 (Supp.1997).

tions, to offer continued employment if performance has been satisfactory.[38] Remedies of back pay and costs, including attorney's fees, are provided.[39] Of significance here, this legislation also provides:

> This chapter shall not be construed to limit an employee's right to bring a common law cause of action for wrongful termination.[40]

Even more recently, in the context of a government procurement statute affording whistleblowers the right to sue their employer if subjected to retaliatory discharge, the Council provided:

> The provisions of this act are not exclusive, and the remedies shall be in addition to any other remedies provided for in any other law or available under common law.[41]

Legislation typically is the result of initiative and advocacy by groups interested in particular issues. The legislative list of wrongful discharge provisions in this jurisdiction obviously indicates evidence of employer retaliation against employees in a variety of situations that employee groups have brought, forcefully, to the Council's attention. We cannot say from this diverse list, however, that the legislature is perfectly satisfied with the law as is. Legislative inaction in one or more particular areas does not necessarily signify a legislature's endorsement of the status quo.

Furthermore, there is no indication that the Council has expressed, or implied, a desire to keep the wrongful discharge area to itself. To the contrary, as we have seen, when recently enacting displaced workers legislation the Council expressly preserved the "employee's right to bring a common law cause of action for wrongful termination." [42] The Council, of course, has shown that it

knows how to cover a field; we would be entirely off base if we were not to conclude that the Council had preempted, for example, the legal fields represented by the exhaustive list of Human Rights Act prohibitions against discrimination in employment,[43] or the comprehensive Rental Housing Act rules governing evictions of tenants at will,[44] or the detailed Workers Compensation Act provisions addressing on-the-job injuries.[45] But wrongful discharge legislation, enacted in individual pieces over the years, leaves room for common law courts to complement the legislature by acting "in one of the 'open spaces' in the law of this jurisdiction" [46] to address on the merits, "yes" or "no," the claims of litigants like Linda Carl, rather than simply punting the subject to the legislature—unless, of course, there are other persuasive reasons why, in this particular area of the law, the legislature is the only agency of government that should act. I turn, more specifically, to that final inquiry.

### III.

Judge STEADMAN offers two reasons why he believes the legislature is better suited than the court to address the subject: "public policy exceptions fashioned by the legislature have the benefit of providing clear notice to employers and employees prior to accrual of a cause of action," *post* at 197, and "the nature and extent of the remedy provided by legislatively enacted public policy exceptions can be tailored to fit the harm in accordance with existing statutes in a way we cannot," *post* at 197.

Before specifically addressing these points, I would note that Judge STEADMAN's views— broadly attacking the court's invocation of public policy to change the common law—

---

38. District of Columbia Displaced Workers Protection Act of 1994 (DWPA), D.C.Code §§ 36–1501 to –1503 (1997 Repl.); *see Washington Service Contractors Coalition v. District of Columbia,* 311 U.S.App.D.C. 407, 54 F.3d 811 (1995) (sustaining DWPA against challenge contending National Labor Relations Act preempts it).

39. *See* D.C.Code § 36–1503(a), (b).

40. *Id.* § 36–1503(c).

41. *Id.* § 1–1188.12 (Supp.1997).

42. *Id.*

43. *See* D.C.Code §§ 1–2525, –2556.

44. *See* D.C.Code § 45–2551 (1996 Repl.).

45. *See* D.C.Code §§ 36–301 to –345.

46. *Clark v. Associated Retail Credit Men, supra* note 15, 70 App. D.C. at 185, 105 F.2d at 64.

cannot logically be limited to employment law; they represent a broadside against virtually any law-making we are called upon to do as a common law court. I read in Judge STEADMAN's reasoning a repudiation of all evolutionary changes the courts of this jurisdiction have adopted in our local jurisprudence of the kinds illustrated earlier in Part I., whether in the areas of consumer credit protection, landlord and tenant relations, infliction of emotional distress, or manufacturer's liability. My colleague's principles, in short, comprise an attack on this court's common law role, not merely on our possible expansion of an employment rule.

### A.

As to my colleague's concern about notice, it is true that a statute commonly is written to operate prospectively (although that is not always the case [47]), whereas a judicial decision typically will apply a new rule in favor of the party who advocated it, even though the loser will be told after the fact that he or she committed a wrong. The common law, however, has always evolved in this way, but usually with plenty of warning from legal articles and treatises, from developments in other states, and even from prior judicial decisions that fire warning shots across the bow in the jurisdiction where a change eventually is made. I doubt that the parties who lost the decisions in the cases discussed earlier were greatly surprised; surely the lawyers had counseled their clients that change might be coming (so that settlement might prudently be pursued). Moreover, in many if not most of the cases, legal counsel is likely

to have given their clients warnings before the conduct found actionable took place.

In any event, the courts, like the legislature, rule prospectively when circumstances warrant.[48] Courts can be as flexible as the legislature in announcing the impact of new judicial doctrine. Almost twenty years ago, for example, this court, sitting en banc, provided four criteria [49] to govern when a new rule of law announced by the court should apply retroactively, partially retroactively to give the prevailing party the benefit of the new rule but otherwise prospectively, or purely prospectively. Judge STEADMAN's "notice" rationale, therefore, is weak indeed.

### B.

The suggestion that the legislature can fine-tune remedies more effectively than the courts is also overstated. Of course legislatures can grant particular remedies and withhold others, including attorney's fees as an incentive or disincentive. But so can the courts. Historically, courts of equity came into being precisely because the law courts, affording damage remedies, had too little flexibility in granting appropriate relief. The courts today, therefore, including the courts of this jurisdiction, have considerable flexibility in crafting remedies, and there is no reason to suppose—if we were to announce a new public policy exception to thwart a particular at-will discharge—that we could not adequately evaluate the circumstances for purposes of deciding whether an equitable remedy, such as reinstatement, should ac-

---

47. *See Edwards v. Lateef,* 558 A.2d 1144 (D.C. 1989) (upholding retroactive application of Uniform Reciprocal Enforcement of Support Act to recover arrearages in child support that accrued before date URESA was amended to include arrearages within definition of duty to support; "statutes that create additional remedies, relate to the modes of procedure or confirm or clarify existing rights do not contravene the general proscription against the retrospective operation of legislation") (citations and footnotes omitted); *cf. Duvall v. United States,* 676 A.2d 448, 450–51 (D.C.1996) (upholding retroactive application of statute permitting deliberations in criminal case to proceed with only eleven jurors; "retroactive application of procedural statutes is proscribed" only if it "impairs the defendant's 'substantial rights'") (citations omitted).

48. *See Mendes, supra* note 3, 389 A.2d at 788–89.

49. The four criteria are:

> (1) the extent of the reliance of the parties on the old rule (including the degree of justifiable reliance and the hardship which might result to the litigants as a result of retrospective application); (2) avoidance of altering vested contract or property rights; (3) the desire to reward plaintiffs who seek to initiate just changes in the law; and (4) the fear of burdening the administration of justice by disturbing decisions reached under the overruled precedent.

> *Id.*

company a legal remedy awarding back pay or other damages.

## IV.

The development of the law has always been dynamic, with courts and legislatures alike initiating change as situations are presented. Sometimes the legislatures follow the courts, as they did, for example, when adopting the Uniform Commercial Code that incorporated the doctrine of unconscionability,[50] recognized first as a common law development;[51] or when enacting, in this jurisdiction, legislation reflecting earlier judicial action[52] to protect tenants against retaliatory eviction for reporting housing code violations.[53]

On other occasions the courts follow the legislature, as this court did, for example, by interpreting the Council's legislation governing summary possession actions as preempting the landlord's common law right of self-help to evict a tenant.[54] Similarly, we held that when the Council enacted a statute requiring employers to provide reasonably safe working conditions for wage earners, the common law defense of contributory negligence could not be used to bar recovery for an injury caused by the employer's failure to comply with the statute and related regulations.[55] The fact that the legislature has

acted one or more times in a broad area of the law, therefore, does not mean that the courts are duty-bound to stay entirely away from it. To the contrary, the courts often have to change common law rules in that area to help make the new legislation work. As I see it, therefore, only when the legislature enacts a comprehensive, preemptive statutory scheme is the court precluded from introducing common law modifications of the rights the legislature created.

Furthermore, if the courts move too far into an area the legislature wants for itself, or even if the legislature merely dislikes what the courts do in a substantive area the legislature has never touched, the legislature can erase a judge-made law (a prerogative the court itself has over the legislature only in the event legislation is held unconstitutional). The Council has shown it can override, sometimes swiftly, any statutory interpretation not to its liking[56] and thus easily could abolish, if it wishes, any common law defense or remedy we might create in the employment area.

What we have, therefore, are two dynamic lawmakers—generators of public policy—that function sometimes in separate spheres (*e.g.*, common law courts do not enact criminal laws) but typically act, as I have tried to

**50.** *See* D.C.Code § 28:2–302 (1996 Repl.).

**51.** *See* U.C.C. § 2–302 cmt. 1, 1A U.L.A. 16 (1989).

**52.** *See Edwards v. Habib, supra* note 9.

**53.** *See* D.C.Code § 45–2552 (1996 Repl.).

**54.** *See Mendes, supra* note 3, 389 A.2d at 787.

**55.** *See Martin v. George Hyman Construction Co.,* 395 A.2d 63, 71 (D.C.1978).

**56.** In Act 8–51, "Good Time Credits Temporary Amendment Act of 1989," 36 D.C.Reg. 4740 (1989) (temporary emergency act); Act 8–71 "Good Time Credits Amendment Act of 1989," 36 D.C.Reg. 5761 (1989) (enrolled original) (amending D.C.Code § 24–434 (1996 Repl.)), the Council of the District of Columbia effectively overruled the federal District Court's ruling in *Cunningham v. Williams,* 711 F.Supp. 644 (D.D.C.1989), *rev'd sub nom. Poole v. Kelly,* 293 U.S.App. D.C. 329, 954 F.2d 760 (1992), where the District judge had held that the Good Time Credits Act applied to persons convicted of first

degree murder. *See Winters v. Ridley,* 596 A.2d 569, 571 ("The Council's reaction" rejecting *Cunningham* "was swift and emphatic.").

In Law 10–232, § 2, "Jury Trial Act of 1994," 42 D.C.Reg. 18 (1995), codified at D.C.Code § 16–705(c) (1997 Repl.)(last sentence), the Council authorized eleven-juror verdicts in criminal cases, in the court's discretion, when "the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict." This legislation effectively overruled this court's decision in *Flemming v. United States,* 546 A.2d 1001 (D.C.1988), where we rejected, as inconsistent with the governing statute, a Superior Court rule authorizing such eleven-juror verdicts.

In Law 4–202, § 3, "District of Columbia Sentencing Improvements Act of 1982," 30 D.C.Reg. 173, 176 (1983), codified at D.C.Code § 16–710(a) (1997 Repl.), the Council authorized "split sentences" whereby the defendant's sentence on one count is divided between a period in prison and a period on probation—a practice this court had declared illegal in *Davis v. United States,* 397 A.2d 951 (D.C.1979).

demonstrate, to improve the law in the same arenas; *e.g.* landlord and tenant, consumer protection, tort law, and employer-employee relations. It is important to keep in mind that the ideas underlying some of the very statutes that protect people against unconscionable and retaliatory behavior reflect doctrines created by the courts interpreting an evolving common law. In fact, to bring the analysis squarely to the case before us, the United States Court of Appeals for the District of Columbia Circuit, in using public policy to ban retaliatory evictions, relied by analogy on a California case that was the first to apply the public policy exception to an employer's retaliatory, and thus wrongful, discharge of an employee.[57]

My concern here is not so much whether this court rejects a particular proffered basis for adopting a public policy exception to the at-will employment rule—though I certainly agree with my colleagues in the majority that Carl should be permitted to proceed with her claim. My principal concern, rather, is that some members of the court would reject such an exception automatically, out of a blind deference to a conclusively presumed legislative prerogative. To the contrary, however, the history of the common law in this country shows that courts and legislatures alike make law on the basis of public policy. The courts, of course, must be cautious and judicious in doing so out of profound regard for the fact that judge-made law should only bring change, usually incremental in nature, that corresponds to norms which the public-at-large has predominantly accepted—or very likely would find acceptable.

Reasonable persons will differ over how far the courts should go in any particular situation, but one should not lose sight of the legislature's prerogative to overrule court decisions when no constitutional issue is involved. The court's common law duty to assure a just result in areas where the legislature has remained silent—and where injury demands a remedy—coupled with a legislative check on adjudication that goes too far, reflects a judicial law-making tradition I am not willing to repudiate in this case or any other.

For the foregoing reasons, and because I believe Judge SCHWELB, Judge TERRY, and Judge MACK make the case for the public policy exception to apply here, I join the court in recognizing an additional exception to the at-will doctrine in this case. I strongly disagree with the rationale offered by the dissent to justify rejection of the majority's approach.

SCHWELB, Associate Judge, with whom Associate Judge FERREN and Senior Judge MACK join, and with whom Associate Judge REID joins as to Parts II, III and IV, concurring:

Linda Carl claims that Children's Hospital discharged her because she had testified before the Council of the District of Columbia in opposition to tort reform legislation and because she had appeared as an expert witness on behalf of plaintiffs in medical malpractice cases. The Hospital moved the court to dismiss the complaint for failure to state a claim upon which relief may be granted. In support of its motion, the Hospital argued that Ms. Carl was an "at-will" employee, and that the Hospital had the right to discharge her for any reason or for no reason.

The trial judge granted the motion to dismiss. He concluded, apparently on the authority of *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C.1991), that in the absence of an allegation that the plaintiff was discharged for refusal to perform an unlawful act, the at-will doctrine barred Ms. Carl's action for wrongful termination. A divided panel of this court affirmed. *See Carl v. Children's Hospital*, 657 A.2d 286 (D.C.1995). We vacated the panel decision and granted Ms. Carl's petition for rehearing en banc. *Carl v. Children's Hospital*, 665 A.2d 650 (D.C.1995) (en banc).

I.

This is one of those cases in which the past is prologue. The at-will employment rule

---

**57.** *See Edwards v. Habib, supra* note 9, 130 U.S.App. D.C. at 138 n. 38, 397 F.2d at 699 n. 38.

states in its unvarnished form that in the absence of a statutory proscription, an employer may discharge an at-will employee for any reason or for no reason. This rule "originated centuries ago as an adjunct to the law of master and servant in England." *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 195, 443 N.E.2d 441, 443 (1982) (footnote omitted). It was, however, soon deemed too rigorous in the land of its birth. "As far back as 1562, England placed statutory limits upon the power of an employer to terminate an employee unless there was 'reasonable cause to do so.' " *Id.*, 457 N.Y.S.2d at 196 n. 4, 443 N.E.2d at 443–44 n. 4 (citing 1 WILLIAM BLACKSTONE, COMMENTARIES 131 (1878)). Nineteenth century British courts applied the presumption that an employment relationship was for one year unless the parties had specified otherwise. *See Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1040 (Utah 1989) (citing Note, *Implied Contract Rights to Job Security*, 26 Stan. L.Rev. 335, 340 (1974)).

When the doctrine was transplanted to the United States, however, it resumed its unconditional classical form. *Weiner, supra,* 457 N.Y.S.2d at 196 n. 4, 443 N.E.2d at 443–44 n. 4 (citations omitted). In this country, its genesis can be traced to an 1877 treatise by Horace G. Wood on the master-servant relationship,[1] and the doctrine came to be known as Wood's Rule. *See* 82 Am.Jur.2d *Wrongful Discharge* § 2, at 670–71 (1992 & Supp.1997); *Berube, supra,* 771 P.2d at 1040; *see also* Judge Ferren's opinion, *ante* at 168 & n. 18. In *Martin v. New York Life Ins. Co.*, 148 N.Y. 117, 119, 42 N.E. 416, 417 (1895), the New York Court of Appeals repudiated the common law's "one year" presumption and "uncritically embraced the at-will rule as framed by Wood." *See Berube, supra,* 771 P.2d at 1041.

There is now a broad consensus among courts and commentators that the authorities relied on by Wood did not support his thesis, and that the courts that adopted Wood's Rule did so without adequate reflection. The Supreme Court of Utah has noted that

> Wood proffered his rule without analysis and cited apparently inapposite authority on its behalf. Notwithstanding its dubious antecedents, the rule was adopted in many jurisdictions without careful and thorough examination.... Most courts offered no rationale or analysis for substituting the at-will doctrine for the common law presumption.

*Berube, supra,* 771 P.2d at 1040 (citations omitted); *see also Weiner, supra,* 457 N.Y.S.2d at 196 n. 5, 443 N.E.2d at 444 n. 5 ("as subsequent commentators have pointed out, [Wood] relied on no more than 'scant authority of questionable value' "); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 239 & n. 1, 448 N.E.2d 86, 93 & n. 1 (1983), (Meyer, J., dissenting) (describing "bizarre" origins of Wood's Rule and confused reasoning underlying its adoption).

Whatever its analytical shortcomings may have been, Wood's Rule was to find "a receptive legal environment in *laissez-faire* nineteenth century America." *Weiner, supra,* 457 N.Y.S.2d at 196, 443 N.E.2d at 444 (citation omitted). His treatise, after all, was about the law of master and servant, and the words master and servant meant what they said—masters were masters and servants were servants.[2] "So strong indeed was the turn-of-the-century legal and socioeconomic philosophy that nurtured [the at-will rule] that for long Federal constitutional law deferred to it as well." *Weiner, supra,* 457 N.Y.S.2d at 196, 443 N.E.2d at 444 (citations omitted).[3] "By the arrival of the twentieth

---

1. *See* HORACE G. WOOD, MASTER AND SERVANT (1877).

2. May I not forbid my family to trade with anyone? May I not dismiss my domestic servant for dealing, or even visiting, when I forbid? And if my domestic, why not my farmhand, or my mechanic, or teamster?
   *Payne v. Western & Atlantic R.R.*, 81 Tenn. (13 Lea) 507, 518 (1884), *overruled on other grounds, Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915).

3. The Supreme Court cases which effectively constitutionalized the at-will doctrine—*Adair v. United States*, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908), and *Coppage v. Kansas*, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915)—have been sapped of their vitality by later decisions sustaining New Deal legislation restricting employers' rights. *See, e.g., NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). The Court eventually came to agree with Justice Holmes that

century, the at-will doctrine was well-established throughout the United States and served to reinforce turn-of-the century ideas concerning *laissez-faire* economics and freedom to contract." *Berube, supra,* 771 P.2d at 1041 (citations omitted).

In this century, however, the at-will doctrine came under intensive attack from legal scholars and others, both for its doctrinal shortcomings and for its unfairness to employees. *See Weiner, supra,* 457 N.Y.S.2d at 196, 443 N.E.2d at 444. Indeed, it has been the "almost unanimous view of the commentators" that the traditional rule should be abandoned or modified, there being "little to recommend its continued application in instances in which the employer's conduct undermines an important public policy." *Smith v. Atlas Off–Shore Boat Serv., Inc.,* 653 F.2d 1057, 1061 (5th Cir.1981) (footnote omitted). The view of the commentators has merit.

A principal justification traditionally tendered on behalf of the at-will doctrine rested on what now appears to be a transparently disingenuous concern for the rights of the employee (coupled with a misapplication of the doctrine of mutuality of obligation):

> An employee is never presumed to engage his services permanently, thereby cutting himself off from all chances of improving his condition; indeed, in this land of opportunity it would be against public policy and the spirit of our institutions that any man should thus handicap himself; and the law will presume ... that he did not so intend. And *if the contract of employment be not binding on the employee for the whole term of such employment, then it cannot be binding upon the employer; there would be lack of "mutuality."*

*Pitcher v. United Oil & Gas Syndicate, Inc.,* 174 La. 66, 139 So. 760, 761 (1932) (emphasis added). The theory of mutuality on which this defense of the rule purports to be founded has been firmly rejected by courts and legal scholars alike, and few would defend it today. *See Weiner, supra,* 457 N.Y.S.2d at

196, 443 N.E.2d at 444; *Berube, supra,* 771 P.2d at 1045, 1A CORBIN ON CONTRACTS, § 6.1, at 197 (1993); Blades, *Employment At Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 COLUM. L. REV. 1404, 1419–21 (1967) (hereinafter *Blades* ).

The once firmly enshrined socioeconomic assumptions underlying the at-will doctrine also appear quite unrealistic today. "[W]hen viewed in the context of present-day economic reality and the joint, reasonable expectations of employers and their employees, the 'freedom' bestowed by the rule of law on the employee may indeed be fictional." *Cleary v. American Airlines,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722, 725 (1980). "The industrial revolution [has] made an anachronism of the absolute right of discharge by destroying the classical ideal of complete freedom of contract upon which it is based." *Blades, supra,* 67 Colum.L.Rev. at 1418 (footnote omitted). "The system of 'free' contract described by nineteenth century theory is now coming to be recognized as a world of fantasy, too orderly, too neatly contrived and too harmonious to correspond with reality." John P. Dawson, *Economic Duress and the Fair Exchange in French and German Law,* 11 TUL. L. REV. 345 (1937). As the court stated in *Smith, supra,*

> [t]he situation of the employer differs drastically from that of the employee. There is nothing more than the appeal of symmetry and a harkening back to hollow notions of mutuality to uphold any suggestion that the rights of employers must correspond to the rights of employees.

653 F.2d at 1061 n. 7 (quoting *Blades, supra,* 67 COLUM. L. REV. at 1426).

These and other authorities demonstrate that the foundations upon which Wood's inflexible version of the at-will doctrine is supposed to rest have been substantially undermined or eclipsed. *Cessanti ratione, cessat ipsa lex.*[4] "The days when a servant was

"[t]he Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." *Lochner v. New York,* 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (dissenting opinion).

4. When the reason for a rule of law ceases, then the rule of law likewise ceases (or, at least, ought to cease). *Cf. Creighton v. Brown,* 77 A.2d 559, 562 (D.C.Mun.1950) (citations omitted) ("[i]f the rule established by precedent ... finds its origin in reasons which no longer exist, and the courts

practically the slave of his master have long since passed." *Greene v. Hawaiian Dredging Co.*, 26 Cal.2d 245, 157 P.2d 367, 370 (1945). A rule born of a bygone era and based on assumptions which few would indulge today should not be retained if its time has come and gone.

> To paraphrase Mr. Justice Holmes, "the law embodies beliefs that have triumphed in the battle of ideas"; when the battle of ideas is over, "the time for law" has come.

*Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 733 (Ky.1983) (quoting OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 294–95 (1920)).[5]

The analytical shortcomings of Wood's Rule, and the obsoleteness of the economic and social theories underlying it, do not constitute the doctrine's only vices. For the century or more that it has been in vogue, the at-will doctrine, flawed at birth, has often operated in a manner which many if not most reasonable people would view as unjust. *See, e.g., Murphy, supra*, 461 N.Y.S.2d at 239, 448 N.E.2d at 93 (Meyer, J., dissenting), (criticizing "[t]he harshness of a rule which permits an employer to discharge with impunity a 30–year employee one day before his pension vests");[6] *Bender Ship Repair, Inc. v. Stevens*, 379 So.2d 594 (Ala.1980) (at-will doctrine authorizes dismissal of employee for serving on grand jury);[7] *Guy v. Travenol Laboratories, Inc.*, 812 F.2d 911, 912–15 (4th Cir.1987) (employee may lawfully be terminated for refusal to falsify records which the employee was required to maintain pursuant to FDA regulations); *Odell v. Humble Oil & Refining Co.*, 201 F.2d 123, 127–28 (10th Cir.), *cert. denied*, 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367 (1953) (at-will doctrine permits corporate employer to discharge employees who testified before grand jury and at trial pursuant to subpoena, where testimony led to employer's conviction on criminal charges); *Buethe v. Britt Airlines, Inc.*, 787 F.2d 1194, 1196–97 (7th Cir.1986) (airline protected by at-will doctrine from liability for discharging co-pilot who declined to fly aircraft which did not meet federal standards of airworthiness; chief pilot had declared that a "co-pilot should keep his eyes open and his mouth shut"); *see also* 82 Am.Jur.2d *Wrongful Discharge*, §§ 34–49 (1992 & Supp.1997); Wanda Ellen Wakefield, Annotation, *Liability for Discharging At–Will Employee for Refusing to Participate in, or for Disclosing, Unlawful or Unethical Acts of Employer or Co–Employees*, 9 A.L.R.4th 329 (1981 & Supp. 1996).

Thirty years ago, Professor Lawrence E. Blades took a long hard look at the doctrine and found it wanting:

> What is important is that such abuses, however common or uncommon, should not go unremedied. Whether for the sake of providing specific justice for the afflicted individual, deterring a practice which poses an increasingly serious threat to personal freedom generally, or instilling into employers a general consciousness of and respect for the individuality of the employee, the law should confront the problem.

*Blades, supra*, 67 COLUM. L. REV. at 1410. His point was well-taken then and remains so today.

"You have stayed in this place too long, and there is no health to you. In the name of God, go!" So spoke Oliver Cromwell in

---

have from time to time found it necessary to make exceptions thereto ... the courts should adapt their procedure to the age in which we live, and cease to follow a precedent for which they have always to apologize").

5. In *Meadows*, the court concluded that the "battle of ideas" over Wood's Rule was over, and held that an employee who alleged that he had been dismissed for filing a worker's compensation claim had the right to sue his employer for wrongful discharge, notwithstanding the absence of any statute proscribing the employer's conduct. 666 S.W.2d at 733. The court explained that "[t]he fear of being discharged would have a deleterious effect on the exercise of a statutory right." *Id.* (quoting *Frampton v. Central Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973)).

6. Judge Meyer was referring to *United Steelworkers of America, Local No. 1617 v. General Fireproofing Co.*, 464 F.2d 726, 728–31 (6th Cir. 1972), a case in which the employee claimed that he was discharged at that point in his career in retaliation for his activities as president of the foremen's club.

7. The *Bender* decision was subsequently superseded by statute. *See Meredith v. C.E. Walther, Inc.*, 422 So.2d 761 (Ala.1982).

dismissing the Rump Parliament in 1658. *See Hercules & Co. v. Shama Restaurant, Corp.*, 566 A.2d 31, 36 (D.C.1989) (citation omitted). Wood's Rule in its original form has some of the attributes of the unfortunate body that Cromwell was addressing. The present case provides the full court with an opportunity to determine whether, and to what extent, we should continue to adhere to a doctrine which, at least in its pristine form, has been abandoned by many courts, and which rests on assumptions that the scholarly community has long perceived to be profoundly flawed.

## II.

Those of my colleagues who differ with the views expressed in this opinion do not necessarily disagree with the apparent near-consensus of the commentators regarding the shortcomings of Wood's Rule. Rather, they pose the fundamental question: who decides? Their basic answer to that question is: not the court! Judge Steadman would leave any revision of the at-will doctrine entirely to the legislature. Judge Terry contemplates a judicial role, but a markedly limited one. The judges favoring affirmance perceive judicial modifications of the rule as unseemly activism. For the reasons stated below, I must respectfully disagree with this assessment.

I begin by noting my agreement with the proposition that legislation enacted by our elected representatives, who are responsible for their actions to the voters, constitutes the principal foundation for the District's public policy. It is inappropriate for judges to interpret the Constitution or a statute to coincide with or reflect the economic and social views of the judges who are doing the interpreting. Statutes enacted by our legislature should not be invalidated on the basis of what a judge reads into the "penumbra" of a constitutional provision.

But this is not a case in which Ms. Carl is asking us to overrule the Council or to intrude into the legislative domain. Wood's Rule came into being by judicial fiat, not by legislative enactment. It has never received the blessing or endorsement of our elected representatives. It is no more "activist" for this court to modify the doctrine than it was

for the nineteenth century courts to promulgate it. Reappraisal of a judge-made rule in the interests of justice is well within the common law tradition.

"[T]he very term 'common law' means a system of law not formalized by legislative action, not solidified *but capable of growth at the hands of judges.*" *Linkins v. Protestant Episcopal Cathedral Found.*, 87 U.S.App. D.C. 351, 354–55, 187 F.2d 357, 360–61 (1950) (Prettyman, J.) (emphasis added). "[T]he former common law should not be followed where changes in conditions have made it obsolete. We have never hesitated to exercise the usual judicial function of revising and enlarging the common law." *Id.* at 355, 187 F.2d at 361 (citation and footnote omitted); *see also Nelson v. Nelson*, 548 A.2d 109, 112 (D.C.1988). Like the Supreme Court of Kentucky, I

> do not think the framers of our Constitution intended to shackle the hands of the judicial branch of government in its interpretation, modification or abolition of the great body of mutable common law to meet the demands of changing times.

*City of Louisville v. Chapman*, 413 S.W.2d 74, 77 (Ky.1967).

It is especially appropriate for the court to exercise its authority to modify the common law where, as I believe in this case, the doctrine sought to be revisited is rooted in an obsolete ideology and has evident analytical shortcomings. "It is revolting to have no better reason for a rule of law than that it was laid down in the time of Henry IV," OLIVER WENDELL HOLMES, THE PATH OF THE LAW 187 (1921), or, for that matter, in the days of President Rutherford Hayes. The following statement by the Supreme Court of Maine fits this case well:

> Although adherence to the principle of *stare decisis* is generally a wise course of judicial action, it does not irreversibly require that we follow without deviation earlier pronouncements of law which are unsuited to modern experience and which no longer adequately serve the interests of justice.

*Beaulieu v. Beaulieu*, 265 A.2d 610, 613 (Me. 1970); *see also Swetland v. Curtiss Airports*

*Corp.*, 55 F.2d 201, 203 (6th Cir.1932) (noting "the traditional policy of the courts to adapt the law to the economic and social needs of the times").[8]

In *Williams v. Baker*, 572 A.2d 1062 (D.C. 1990) (en banc), a case quite similar to the present one in respects here relevant, the plaintiff asked the court to abandon the traditional "impact rule," which provided that there could be no recovery for negligently inflicted emotional distress in the absence of physical injury. *Id.* at 1064. One judge of this court argued that a common law rule which had been in effect for more than two centuries should not be judicially abrogated where "[n]either Congress nor any local government body has ever seen fit to change it." *Id.* at 1073 (opinion of Reilly, J.). Notwithstanding the lack of any evidence that the legislature was dissatisfied with existing law, the en banc court overruled its well-entrenched prior jurisprudence by a vote of eight to one. The court noted that "[t]he vast majority of jurisdictions ... have abandoned or refused to adopt the impact rule," *id.* at 1066, and cited a number of scholarly articles and commentaries in support of its decision. *Id.* at 1065–69.

The situation in the present case is somewhat analogous. By 1991, according to one compilation, forty-five states had made at least some modifications to Wood's Rule, 82 AM.JUR.2D *Wrongful Discharge* § 8, at 676–77 (1992 & Supp.1997);[9] *see also* Judge Mack's opinion, *post*, at 186. Moreover, as I have noted, scholarly condemnation has apparently been almost universal. *Smith, supra*, 653 F.2d at 1061.

It is important to note what this case is *not* about. I have previously expressed my disagreement with the notion that

> where a statutory enactment authorizes a particular result only in situations A, B,

and C, a court which is not satisfied with this arrangement can order the same result in situation D by "creative expansion" of the common law or by some similar doctrine.

*Gallimore v. Washington*, 666 A.2d 1200, 1215 (D.C.1995) (separate opinion of Schwelb, J.). I adhere to that position here; it is not the function of the court to upset a legislative compromise.

But as Judge Ferren has explained, *ante* at 170–172, the Council of the District of Columbia has not adopted legislation designed to define the permissible scope of the at-will rule or to declare that doctrine's limits. Although the legislature has enacted specific provisions to deal with particular problems which have been brought to its attention,[10] these statutes were plainly not designed to preempt the development of the common law of wrongful termination. Indeed, in 1994, in providing legislative protection from wrongful discharge for employees of certain contractors, the Council expressly provided:

> This chapter shall not be construed to limit an employee's right to bring a common law cause of action for wrongful termination.

D.C.Code § 36–1503(c) (1997); see also opinion of Ferren, J., *ante*, at 171.

It is fair to conclude, especially in light of this provision, that modification by this court of the at-will doctrine, in conformity with the conventional processes of the common law, would not constitute interference with legislative prerogatives. When the legislature criminalized threats to witnesses who testified before it, *see* D.C.Code § 1–224 (1992), it did not thereby create a statutory civil action for damages for employees in Ms. Carl's circumstances. *See, e.g., Fountain v. Kelly*, 630 A.2d 684, 690 (D.C.1993) ("where a statute expressly provides a particular remedy, a

---

**8.** I also note that the en banc court owes less loyalty to prior division decisions than to an earlier en banc holding.

**9.** Although the reference to forty-five states appears in a section titled "Judicial Developments," it appears that these states may also include jurisdictions which have made statutory modifications of the at-will doctrine. *See also* Michael A. DiSabatino, Annotation, *Modern Status of Rule that Employer May Discharge At–Will*

*Employee for Any Reason*, 12 A.L.R.4th 544 (1982 & Supp.1996).

**10.** *See, e.g.*, D.C.Code § 1–224 (1992) (making it a crime to coerce or threaten a witness for testifying before the Council); §§ 36–1501 *et. seq.* (1997) (providing statutory right of action for wrongful discharge for employees of certain contractors).

court must be chary of reading others into it") (citation omitted). It would be altogether unreasonable, on the other hand, to infer from Section 1–224 that the Council meant to foreclose a common law right of action for wrongful termination.

In the present context, as in others, the court should act prudently and with restraint. The doctrine of *stare decisis* plays "an important role in orderly adjudication," and it also "serves the broader societal interests in even handed, consistent and predictable application of legal rules." *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 272, 100 S.Ct. 2647, 2656, 65 L.Ed.2d 757 (1980) (plurality opinion) (footnote omitted). These are important considerations to which any responsible court will accord significant weight. But the restraint appropriate to this case is that commanded by respect for precedent. We should not hastily or improvidently cast aside our own prior decisions, and we should ensure that the common law develops in an orderly manner, but that is all of the self-restraint that is required. I respectfully but firmly disagree with the view that in the present context, any but the slightest modification of a judge-made doctrine would usurp the authority of the legislative branch.

### III.

As the court has today recognized,

> there is nothing in the *Adams* opinion that bars this court—either a three-judge panel or the court en banc—from recognizing some other public policy exception when circumstances warrant recognition.

Indeed, eight of the ten judges of the en banc court have rejected the proposition that in the District of Columbia, *Adams* represents the only permissible variation from the at-will doctrine.

In his concurring opinion, however, Judge Terry states, *inter alia*, that "the recognition of any public policy exception to the at-will doctrine must be solidly based on a statute or regulation that reflects the public policy to be applied, or (if appropriate) on a constitutional provision concretely applicable to a defendant's conduct." *ante* at 163. It is with respect to this assertion that he and I part company. In my view, the quoted language is too restrictive, and its application would protect Wood's Rule from judicious evolutionary change effected in conformity with the common law tradition.

The authority of a common law court to modify a judge-made rule, where that rule's intellectual foundations have crumbled, is not limited in the way that Judge Terry suggests.[11] In *Williams v. Baker*, for example, this court's rejection of the long-entrenched "impact" rule was not "solidly based on a statute or regulation," or on the Constitution. Indeed, there was no constitutional or statutory provision, nor any regulation, on which this change in the law could be grounded, and none was cited in the opinion of the court. Significantly, the authorities on which the court did rely in *Williams* as justifying a major change in judge-made law were the decisions of other common law courts and the views of enlightened scholars and commentators. *See Williams, supra,* 572 A.2d at 1065–1069. There is no persuasive reason to reject in at-will doctrine cases the very kinds of sources which we invoked in *Williams* as grounds for relegating the impact rule to oblivion.

The origins of the more restrictive language reflected in some of our earlier opinions in this area[12] may be, at least in part, semantic. Proposed judicial modifications of Wood's Rule have consistently been characterized as "public policy" exceptions. *See, e.g., Adams, supra,* 597 A.2d at 32. Seizing on this nomenclature, some courts have assumed that, because "public policy" necessarily involves "policy," and because legislatures (and not judges) are supposed to make "policy," any exceptions to the at-will rule must be effectuated by the legislature and not by courts. Use of the phrase "public policy exception" presents the issue before us in a way that implies a threat of judicial intrusion

---

11. Significantly, in footnote 5 to his concurring opinion, and in the first sentence of footnote 4, Judge Terry wisely leaves the door open for at least some measure of flexibility.

12. *See, e.g., Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285, 289 (D.C.1989) (contemplating that a public policy exception would be "statutorily declared").

upon a legislative domain. If we invoked Judge Prettyman's language in *Linkins, supra,* and inquired whether "changes in conditions have made [Wood's Rule] obsolete," 87 U.S.App. D.C. at 355, 187 F.2d at 361, then the spectre of activism might perhaps recede in the reader's mind. Here, as in so many situations, the phrasing of the question may have a good deal to do with the character of the answer.[13]

This is not to suggest that the recognition of exceptions to, or modification of, an existing judge-made rule lacks any connection with "policy." Common sense tells us that the contrary is the case. In *Williams v. Baker,* we described as a "question of policy for the court" the determination whether the impact rule was to stay or go. 572 A.2d at 1072. We decided that question, however, because to do so was well within the judicial function. If, as Judge Prettyman has writ-

ten, the common law is "not solidified but capable of growth and development at the hands of judges," *Linkins, supra,* 87 U.S.App. D.C. at 354–55, 187 F.2d at 360–61, then that "growth" must necessarily implicate the judges' views of the "interests of justice," *Beaulieu, supra,* 265 A.2d at 613, and thus of policy.

Because this is so, judges should exercise considerable restraint "lest they mistake their own predilections for public policy which deserves recognition at law." *Gantt v. Sentry Insurance,* 1 Cal.4th 1083, 4 Cal. Rptr.2d 874, 881, 824 P.2d 680, 687 (1992) (citation omitted). But Wood's Rule itself came into being because it reflected the "predilections" of Mr. Wood (and of the judges who adopted his doctrine) in favor of a *laissez-faire* form of capitalism in which the worker's livelihood depended on the caprice

---

**13.** The concept of judicially formulated "public policy" most frequently arises in the area of contract law, when a party to an agreement argues that its enforcement would be contrary to the public good. Courts are well-advised to exercise great restraint before invalidating an agreement when its provisions do not contravene a statute or regulation, for

> the right of private contract is no small part of the liberty of the citizen and ... a most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare.

*Baltimore & Ohio Southwestern Ry. Co. v. Voigt,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900). "Public policy is a very unruly horse, and when you are once astride it you never know where it will carry you." *Tracey v. Franklin,* 67 A.2d 56, 58 (Del.1949) (quoting Burroughs, J. in *Richardson v. Mellish,* 2 Bing. 229); *see also* 14 SAMUEL WILLISTON. A TREATISE ON THE LAW OF CONTRACTS, § 1629, at 7–8 (3d ed.1972). "Manifestly, the [public policy] principle may not be invoked by the judges of a court to promote their private notions of good or expedient policy." *Bartron v. Codington County,* 68 S.D. 309, 2 N.W.2d 337, 343 (1942).

Considerations which arise in the contract context differ from those applicable here. Where competent adults have agreed upon the terms of a contract, and where those terms are not prohibited by statute or regulation, a court's refusal to enforce the agreement reflects a very high level of judicial assertiveness. Judicial recognition of an exception to the judge-made at-will doctrine does not override any recognizable "lib-

erty of the citizen," *Voigt, supra,* 176 U.S. at 505, 20 S.Ct. at 387, and appears to me a significantly less radical step. Even in the contract area, however, I believe that the restrictions suggested in the portion of Judge Terry's opinion which I have quoted in the text, *supra,* at 180, are too confining:

> Constitutions and statutes are declarations of public policy by bodies of men [and women] authorized to legislate. It is the function of the courts to interpret and apply these, so far as they go and so far as they are understandable. Some judges have thought that they must look solely to constitutions and statutes and to earlier decisions interpreting and applying them as the sources from which they may determine what public policy requires. This is far from true, even though these are the sources that are first to be considered and that often may be conclusive.

> \* \* \* \*

> It has frequently been said that such public policy is a composite of constitutional provisions, statutes, and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy.

6A CORBIN ON CONTRACTS, § 1375, at 15 & n. 12 (1962 & Supp.1997) (quoting *Pittsburgh C., C. & St. L.R. Co. v. Kinney,* 95 Ohio St. 64, 115 N.E. 505, 507 (1916)).

of his or her employer. This court has the authority, under familiar common law principles, to alleviate the rigors of a doctrine based on the social and economic views enforced by judges of another time. We should exercise that authority wisely, but we are not bound to stay our hand simply because no statute or regulation has created the proposed exception at issue. Where such a proposed exception would promote or advance values protected by a statute or, as in this case, by the Constitution, see Part IV, *infra*, we should not hesitate to adopt it.

### IV.

I now turn to the application of the foregoing principles to the case before us. We are called upon to decide whether the facts alleged in Ms. Carl's complaint, the truth of which must be assumed for the purposes of the Hospital's motion to dismiss, justify a departure from the at-will doctrine. In making this determination, we are free to consider relevant decisions by courts in other jurisdictions, scholarly commentaries, and any other appropriate common law source.

In formulating exceptions to the rigorous commands of Wood's Rule as originally formulated, the courts have generally recognized three categories of protected employee conduct:

1. exercising a constitutional or statutory right;

2. refusing to engage in illegal activity; and

3. reporting criminal conduct to supervisors or outside agencies.

*Cf.* 82 AM.JUR.2D *Wrongful Discharge* § 15, at 688 (1992).[14] The present case involves only the first of these categories.[15] Ms. Carl contends, in substance, that by discharging her for testifying before the Council and for appearing as an expert witness for plaintiffs in medical malpractice cases, Children's Hospital has retaliated against her for exercising her right to free speech. Such retaliation, according to Ms. Carl, is contrary to the

public interest because it chills the exercise of fundamental rights. .

The First Amendment provides that "Congress may pass no law abridging ... freedom of speech." "It is, of course, commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) (citation omitted). The Amendment does not apply to private conduct. *Id.* Ms. Carl has not alleged that Children's Hospital is a governmental actor. If, as Judge Terry suggests, an exception to the at-will doctrine must have as its basis a provision "concretely applicable to the defendant's conduct," *ante* at 163, then Ms. Carl's "free speech" argument must fail.

If, however, the court's common law authority is not so restricted, and if the court is free, as I believe it must be, to recognize an exception that affirmatively promotes the values protected by the First Amendment, then the result must surely be different.

> We have become a nation of employees. We are dependent upon others for our means of livelihood, and most of our people have become completely dependent upon wages. If they lose their jobs they lose every resource, except for the relief supplied by the various forms of social security. Such dependence of the mass of the people upon others for *all* of their income is something new in the world. *For our generation, the substance of life is in another [person's] hands.*

F. TANNENBAUM, A PHILOSOPHY OF LABOR 9 (1951) (emphasis in original). Because of this economic dependence on the part of employees, the at-will doctrine effectively "forces the non-union employee to rely on the whim of his employer for [the] preservation of his livelihood." *Blades, supra,* 67 Colum.L.Rev. at 1405. This dependence "tends to make him a docile follower of his employer's every wish," *id.,* and may inhibit him

---

**14.** The specific reference in 82 AM.JUR.2D is to a "statutory right." *Id.* at 688. The discussion of that right, however, embraces "exercising the right to free speech." *Id.* § 34, at 706.

**15.** This court has, however, previously adopted the second enumerated exception. *See Adams, supra,* 597 A.2d at 32.

from speaking his mind freely if what he would like to say differs from that which the employer would like to hear.

The "central commitment of the First Amendment ... is that debate on public issues should be uninhibited, robust and wide open." *Bond v. Floyd*, 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966) (citation omitted). "It is the purpose of the First Amendment to preserve an uninhibited market-place of ideas in which truth will ultimately prevail...." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). "[W]hat is essential is not that everyone shall speak, but that everything worth saying shall be said." *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 122, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1973) (quoting ALEXANDER MEIKLEJOHN, POLITICAL FREEDOM 26 (1948)). If an employee like Ms. Carl places her livelihood in jeopardy by speaking out on an issue of public concern, then the "market-place of ideas" is not uninhibited in any realistic sense. The ultimate victory of the forces of truth, which is supposed to emerge from free and open debate, then becomes a far more iffy prospect.

For these very reasons, the Supreme Court has recognized that although the First Amendment plays no direct role in cases not involving governmental action, "statutory *or common law* may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others." *Hudgens, supra*, 424 U.S. at 513, 96 S.Ct. at 1033 (emphasis added). Indeed, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources *is essential to the welfare of the public.*" *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945) (emphasis added). The public interest is thus disserved by "repression of [freedom of expression] by private interests." *Id.* (footnote omitted).

These principles are profoundly relevant to at-will doctrine jurisprudence. In *Novosel v. Nationwide Ins. Co.*, 721 F.2d 894 (3d Cir.1983), the plaintiff, a district claims manager for Nationwide, alleged that he was discharged for refusing to participate in Nationwide's effort to lobby the Pennsylvania legislature in favor of proposed "no-fault" legislation, and for privately stating his opposition to the company's political stand. The trial judge dismissed the complaint, but the Court of Appeals reversed. Applying Pennsylvania law, the appellate court concluded, *inter alia*, that "the protection of an employee's freedom of political expression would appear to involve no less compelling a societal interest than the fulfillment of jury service or the filing of a workers' compensation claim." *Id.* at 899. The court found it to be beyond doubt that "speech on public issues has always rested on the highest rung of the hierarchy of First Amendment values," and that "the right to petition or not petition the legislature is incorporated within protected speech on public issues." *Id.* & n. 7 (citations omitted). The court acknowledged that Nationwide was not a state actor, and that the plaintiff would have to rest his claim of wrongful termination on the common law rather than on the Constitution. *Id.* at 900. The court was of the opinion, however, that "an important public policy is in fact implicated wherever the power to hire and fire is utilized to dictate the terms of employee political activities," *id.*, and that *"[t]he protection of important political freedoms ... goes well beyond the question whether the threat comes from state or private bodies." Id.* (emphasis added). The court therefore remanded the case for trial.

In *Bishop v. Federal Intermediate Credit Bank*, 908 F.2d 658 (10th Cir.1990), the plaintiff, a bank employee, claimed that his employer (FICB) had discharged him in retaliation for testifying at a Congressional hearing.[16] He contended that FICB's action violated the First Amendment and Oklahoma public policy. The trial judge granted summary judgment on both claims. The Court of Appeals agreed with the trial judge that

---

16. Bishop was the president of a "production credit association" apparently controlled by FICB.

the First Amendment had not been violated, concluding that FICB "is not a government actor for purposes of establishing constitutional deprivations." *Id.* at 663. The court held, however, that "truthful testimony at congressional hearings is an act consistent with a clear and compelling public policy that justifies a public policy exception to the at-will employment doctrine." *Id.* at 662 (citation and internal quotation marks omitted). The court recognized this exception even though Bishop's claim was not rooted in any constitutional or statutory command.[17]

The present case is obviously quite similar to *Novosel* and *Bishop.* The courts in those cases held that the at-will doctrine ought not to be automatically followed where its application would chill the exercise of rights protected from governmental restraint by the First Amendment. These decisions make eminent sense, and we should follow them. "Our progressive capital ought not to be left behind." *Gray v. Citizens Bank,* 602 A.2d 1096, 1099 (D.C.) (Schwelb, J., concurring), *vacated, id.* at 1102, *opinion reinstated on denial of rehearing en banc,* 609 A.2d 1143 (D.C.1992) (en banc).

## V.

This does not end our inquiry. Ms. Carl's right to express herself freely is not the only interest to be considered in this case. The calculus must also embrace Children's Hospital's perspective. If an employee conducts herself in a manner which significantly impairs her employer's interests, then her claim loses much of its force.

The decision of the Supreme Judicial Court of Massachusetts in *Korb v. Raytheon Corp.,* 410 Mass. 581, 574 N.E.2d 370 (1991), is illustrative. Korb, a former Assistant Secretary of Defense, walked through the "revolving door" and became Vice President of Raytheon Corporation and a spokesman for his new employer in Washington, D.C. Raytheon, a weapons manufacturer, was a major defense contractor. In remarks which were reported in the *Washington Post,* Korb criticized proposed increases in defense spending and, in the Supreme Judicial Court's words, "publicly expressed views in direct conflict with the corporation's economic interest." *Id.* 574 N.E.2d at 371. Raytheon promptly discharged Korb, who in turn brought an action for wrongful termination. Korb contended that his dismissal abridged his right to freedom of expression, contravened the Massachusetts Declaration of Rights, and violated that state's public policy. In affirming the entry of summary judgment in Raytheon's favor, the court firmly rejected Korb's contentions:

> Korb characterizes the public policy at issue too broadly. His situation is not that of an employee who is fired for speaking out on issues in which his employer has no interest, financial or otherwise. To the contrary, Korb was hired to be the corporation's spokesperson, and he spoke against the interests of the corporation. The topic was one of acute concern to Raytheon. Regardless of whether Korb believed himself to be acting privately rather than as a Raytheon employee, and regardless of what Korb actually said, the public perception after the press conference was that a Raytheon lobbyist advocated a reduction in defense spending. Raytheon had a financial stake in not advocating that position. Therefore, it determined that Korb had lost his effectiveness as its spokesperson. There is no public policy prohibiting an employer from discharging an ineffective at-will employee. The fact that Korb's job duties included public speaking does not alter this rule.

*Id.* 574 N.E.2d at 372 (footnote omitted).

The court's opinion is well-reasoned, and I have no quarrel with it. It would make little

---

17. In ruling in the plaintiff's favor, the court in *Bishop* also stated:

> Recognition of the exception supports our tradition of free, direct and truthful testimony at legislative hearings, a policy Oklahoma has implicitly recognized. *Cf.* Okl. Stat. Ann. title 12, § 411 (1988) ("No testimony given by a witness ... before any committee ... shall be used as evidence in any criminal proceeding against him in any court....").

908 F.2d at 662. This statutory provision, like D.C.Code § 1–224, can be read as supportive of an employee's freedom to testify. Like its District of Columbia counterpart, however, the Oklahoma statute contains no prohibition against the discharge of an employee by the employer for testifying before a legislative body. See Judge Mack's opinion, *post,* at 193.

sense to require an employer to retain in office, and doubtless pay a large salary to, a corporate Vice President whose highly publicized conduct has been contrary to the employer's interests in relation to a matter of immediate and acute concern. The court suggested, however, that the result would have been different if Raytheon's financial or other interest had not been implicated. That also makes good sense.

In the present case, Ms. Carl allegedly testified in opposition to tort reform and on behalf of medical malpractice plaintiffs.[18] If Children's Hospital can demonstrate that this case is analogous to *Korb*, and that this type of exercise of First Amendment rights by a probationary non-management employee could significantly harm the Hospital's financial interest, then this will constitute a formidable defense. It is certainly not obvious, however, that this case is more like *Korb* than like *Novosel* and *Bishop*. We should not conclude, on the basis of Ms. Carl's complaint alone, that Children's Hospital is entitled to judgment on the strength of *Korb*. Rather, we should remand the case to the trial court for an appropriate factual inquiry.

In relation to any proceedings on remand, the court and jury should be required to

> balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

*Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 511 (1980). We add the obvious: the public also has an interest in the free expression of ideas on political and other issues.

In *Novosel*, the Court of Appeals remanded the case to the district court with directions to conduct a four-part inquiry:

1. Whether, because of the speech, the employer is prevented from efficiently carrying out its responsibilities;

2. Whether the speech impairs the employee's ability to carry out [her] own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. Whether the manner, time and place in which the speech occurs interferes with business operations.

721 F.2d at 901 (citation omitted). I would add to the first of these categories "or from pursuing its business interests." With that qualification, I believe that *Novosel* provides a useful methodology for conducting the *Pierce* inquiry.

Some of my colleagues are of the opinion that these standards are too vague, and that the employer is entitled to know with precision when he may or may not discharge an employee. I do not agree. There is undoubtedly a measure of balancing which must be undertaken if the inquiry that I have set forth is followed. Nevertheless, the criteria in *Pierce* and *Novosel* are no more general than those in many other areas of the law. As Justice Holmes wrote for the Court in *Nash v. United States*, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913),

> the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or short imprisonment, as here; he may incur the penalty of death.

*Id.* at 377, 33 S.Ct. at 781. Here, the defendant is not faced with imprisonment or death, and Justice Holmes' reasoning applies *a fortiori*.

---

**18.** The adoption of tort reform legislation could obviously redound to the financial advantage of a private hospital. Ms. Carl, on the other hand, was employed as a nurse, not as a Vice President or lobbyist. Her testimony before the Council would not necessarily have a negative effect on her ability to do her job. Korb's publicized state-

ments, on the other hand, necessarily destroyed his effectiveness as a spokesman for Raytheon. Moreover, it is not readily apparent why Ms. Carl's testimony as a plaintiff's expert witness in medical malpractice cases would negatively affect Children's Hospital if Children's was not the defendant.

In those cases in which an employer has a persuasive business justification for discharging an employee, it is unlikely that he will be held liable for damages under the standard that I suggest. It is possible, of course, that in a close case, the employer will stay his hand, and will keep on an employee who has spoken out, even under circumstances in which the court might sustain a discharge if the controversy were to go to trial. That, however, is not too steep a price to pay for alleviating the harshness of an especially restrictive judge-made doctrine. Where Wood's Rule is applied with rigor, the resulting injustices are palpable. Even if the adoption of the exception I propose were to result in the retention, from time to time, of a legally dismissable employee, the world will not end on that account. Indeed, this result might, in the long run, promote the achievement of the free marketplace of ideas which differentiates our democracy from less enlightened forms of governance.

It should not be an inexorable principle of our law that he who pays the piper must always call the tune. The relatively modest departure from the at-will doctrine suggested in this opinion will not render the employer defenseless. It will, however, help to free the law from a judicially imposed albatross which has not served us well.

MACK, Senior Judge, with whom Associate Judges FERREN and REID join, and Associate Judge SCHWELB joins in part,* concurring in part:

## I.

I concur whole-heartedly in the pronouncement of the en banc court that either a three-judge panel of this court, or the court en banc, may recognize a public policy exception to the employment-at-will doctrine—a position which I advanced at length in dissenting from the panel's decision denying relief in the instant case. See my dissenting opinion (attached as APPENDIX hereto) in *Carl v. Children's Hosp.*, 657 A.2d 286 (*Carl I*), *vacated on grant of reh'g en banc*, 665 A.2d 650 (D.C.1995). I am, therefore, delighted

that today the majority of the members of this court, sitting en banc, agrees with Ms. Carl that the opinion of *Gray v. Citizens Bank*, 602 A.2d 1096, *opinion reinstated on denial of reh'g en banc*, 609 A.2d 1143 (D.C. 1992), should be overruled to the extent that it could be interpreted as holding (as did the majority in *Carl I*) that a division of this court is not free to recognize a public policy exception to the employment-at-will doctrine.

However, as so often is the case, issues convert, expand, take priority, or disappear altogether during en banc consideration. Since a majority of the members of this en banc court agrees today that a division of the court, or the full court, may recognize exceptions to the at-will doctrine, the issues become those of (1) to what extent may the courts identify a wrongful discharge in violation of public policy, (2) whether Ms. Carl has made a sufficient showing to justify a public policy exception, and (3) whether she has been improperly denied the right to do so as a matter of law before the trial court and a three-judge panel of this court.

Thus, as the en banc court notes, *see supra* at 5, Ms. Carl's allegations of *retaliatory* discharge for public activities (and her denial of the hospital's asserted reasons for the discharge) must be construed in the light most favorable to her; yet the trial court dismissed her complaint for failure to state a claim upon which relief could be granted. In coming to this court, Ms. Carl, understandably without much confidence in division reversal (in view of the *Gray* dictum which we disapprove today), unsuccessfully sought an initial hearing en banc.

## II.

Judge Terry, however, expresses concern "lest we allow 'public policy' exceptions to swallow up the at-will doctrine...." Judge Terry's opinion, *supra*, at 162. He would, therefore, restrict this court's recognition of such exceptions to only those cases where the exception *is firmly anchored or solidly based in a statute or regulation* which clearly reflects the "public policy" being relied

---

\* *Associate Judge* SCHWELB does not join the discussion of D.C.Code § 1–224, *see infra* at 188–189,

and expresses no opinion as to the Code of Conduct of the American Nurses Association.

upon. For the reasons stated at length in my (division) dissent (*see* APPENDIX, *infra*), I cannot agree to such a drastic restriction. *See also* Judge Ferren's opinion, issued today, *supra*, at 166, tracing the history of the common law role of the courts in law making. I would add that the underpinnings of the employment-at-will doctrine (an agrarian, patriarchal, master-servant relationship of the English feudal system) proved to be ill-suited for our increasingly industrialized society. DAWN D. BENNETT-ALEXANDER & LAURA B. PINCUS, EMPLOYMENT LAW FOR BUSINESS 8–10 (1995) ("BACKGROUND—THE EMPLOYMENT AT-WILL DOCTRINE"); *see also* Judge Schwelb's opinion, *supra*, at 174. It is for this very reason that, in our country, legislators, faced with the problems of an ever-increasing workforce, found it necessary to provide statutory guidance in the area of diversified employee-employer relationships. BENNETT-ALEXANDER & PINCUS, *supra*, at 9.

In my view, therefore, it would be most unwise for this court, sitting en banc as the highest court of the District of Columbia, to restrict, summarily and in an *evidentiary* vacuum, its own authority to recognize public policy exceptions to an ancient doctrine (tailored to another time and place) except where that policy is firmly anchored or solidly based in a present-day statute. In the first place, statutes with general preambles of intent (unlike courts which deal with individual but myriad factual situations), ofttimes spawn litigation in a search for the true articulation and possible application of public policy. Thus, it was, and is, that employees like Ms. Carl—both those that fit neatly into a protected category of a statute and those that do not—turn to the courts for what they consider to be unjust treatment, seeking damages or other relief. In answer thereto, both state and federal courts in the role of this common law heritage have identified, on a case by case basis, public policy exceptions to the at-will doctrine. Moreover, this role is not a matter calling for abstract abstinence, since in spite of contractual or legislative protection, it is estimated that some 65% of the work force is still covered by the employ-ment-at-will doctrine. BENNETT-ALEXANDER & PINCUS, *supra*, at 11.

In this regard, this court has not been extravagant in recognizing public policy exceptions to the doctrine. As Judge Terry points out, *Adams v. George W. Cochran & Co.*, 597 A.2d 28 (D.C.1991), created only one "narrow exception" to the at-will doctrine (protection from discharge because of refusal to violate a statute). As the en banc court holds, however, nothing in *Adams* bars this court—either a three-judge panel or the court en banc—from recognizing some other public policy exception when circumstances warrant such recognition. That is why I think it is unwise for us today, sitting en banc, and reading two panel decisions [1] "together," to restrict our historic role in identifying public policy considerations.

Moreover, when one reviews the court decisions in other jurisdictions which have ruled with respect to at-will exceptions (*see* APPENDIX, *infra*, at 191–192), one can take a sanguine approach to any expressed fear that public policy is such a nebulous concept as to call for judicial restraint. In this regard, I commend the logic of an Illinois court reviewing a worker's claim of retaliatory discharge for the act of supplying information to law enforcement officers of a co-worker's criminal activities. In *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), the court, after discussing the history of the tort of retaliatory discharge, explained that the law would not support the termination of an at-will employment where the termination would contravene public policy. The court acknowledged that "the Achilles heel of the principle lies in the definition of public policy" and continued:

> There is no precise definition of the term. In general it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. *It is to be found in the State's constitution and statutes and when they are silent, in its judicial decisions.* Although there is

---

1. *Adams, supra,* and *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.,* 565 A.2d 285 (D.C.1989).

no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharge shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

\* \* \* \* \*

It is clear that Palmateer has here alleged that he was fired in violation of an established public policy.... *There is no public policy more basic, nothing more implicit in the concept of ordered liberty than the enforcement of a State's criminal code. There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.*

*Id.,* 52 Ill.Dec. at 15–17, 421 N.E.2d at 878–80 (emphasis added) (citations omitted); *see also Bishop v. Federal Intermediate Credit Bank,* 908 F.2d 658 (10th Cir.1990) (allowing suit when the plaintiff alleged discharge from employment for testifying before a congressional committee); *cf. Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980) (majority and dissenting opinions) (cited in *Carl I; see* APPENDIX, *infra,* at 192, 194).

Finally, in the case before us, even if we were to agree that Judge Terry is wise (if not correct) in urging that we limit our ability to define public policy only where such policy is solidly based in a statute, Ms. Carl is entitled to relief because her claim is firmly rooted in statutes.

### III.

In the instant case, Ms. Carl (in alleging a retaliatory discharge in violation of public policy) relied *inter alia* upon the language of D.C.Code § 1–224 (1981), which states:

**2.** The fact that the D.C. Council has not seen fit to enact a statute authorizing this court to entertain a civil action against the employer is of no moment. In our common law heritage, as Judge Ferren has so ably traced, we already have that power.

**3.** *See also* APPENDIX, *infra,* at 192 (collecting state court cases protecting employees from nine

Whoever, corruptly or by threat of force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before the Council ... shall be fined not more than $2,000 or imprisoned not more than 2 years, or both.

Ms. Carl turns to D.C.Code § 1–224 in her attempt to identify the public policy we have been talking about, namely, the promotion and protection of every citizen's right to testify before the legislature and the enormity of employer conduct that (1) would discharge her for exercising that right, and (2) would assert a pretextual reason for the discharge that would leave her without the protection of a public policy exception. I see no reason for characterizing this criminal statute as being *too attenuated* from the retaliation issue at hand to deny Ms. Carl the right to rely upon it as a statutory indication of public policy. *Cf. Palmateer, supra; Bishop, supra.* A threat to the loss of a job is a threat to the loss of property—*an injury* to victims or prospective victims for their attempts to exercise rights protected under statutes.

Moreover, the identification of public policy exceptions does not rise or fall upon the attenuation, or lack thereof, of a D.C.Code criminal provision.[2] In recent years, the threat of "retaliation" has found its way into federal protective employment legislation and case decisions. *See, e.g.,* Title VII of the Civil Rights Act, as amended by the 1991 Civil Rights Act, 42 U.S.C. § 2000–e(3)(a) (1994); Age Discrimination in Employment Act, 29 U.S.C. § 623(d) (1994); Family and Medical Leave Act, 29 U.S.C. § 2615 (1994); Americans With Disabilities Act, 42 U.S.C. § 12203(a) (1994).[3] Thus only last term, our Supreme Court ruled unanimously that Title VII's anti-retaliation provision protected a discharged employee who alleged that his former employer gave a negative reference to a prospective employer in retaliation for

types of retaliation). For example, we take steps to protect employees who appear for jury service to promote our very existence. Certainly in protecting employees who appear to testify before the legislature we are promoting a legislatively defined public service.

his having filed a charge against the former employer with the Equal Employment Opportunity Commission. *See Robinson v. Shell Oil Co.,* —— U.S. ——, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Thus in the broad sense, the principle that it is against public policy to retaliate against an employee for exercising a citizen's right or duty is solidly based in federal legislation as well as case law we are bound to recognize.

Perhaps the seriousness of this issue is obscured by the suggestion that Ms. Carl has somehow exhibited disloyalty inimical to the interest of her employer. We are in no position, on this record, to make such an assumption. It is somewhat a "leap of logic" to conclude summarily, without more, that tort reform legislation (limiting damages in medical malpractice cases) (1) would benefit this venerable institution, renowned world wide for its services to children, and that (2) the testimony of Ms. Carl "on" that legislation would justify her discharge. The fact that the hospital has asserted legitimate reasons for the discharge (reasons asserted by Ms. Carl to be "pretextual") should not defeat the right of this employee to have her day in court—a scenario that may well redound ultimately to the benefit of either or both employer and employee. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### IV.

In conclusion, we may acknowledge the fact that in its inception the employment-at-will doctrine protected both wealthy landowners and, presumably, serfs. Even today, in our highly industrialized society, the right to terminate employment may be mutually advantageous to both employer and employee. The right to discharge, however, is not mutual to both. For this reason, we must also acknowledge an indisputable fact: When an employer decides to discharge an employee, there is always a reason for that discharge. In the broader sense of personal assessment, that reason may be thought to be unfair or unjustified, but that is not important. It is important, however, that the discharge not be grounded on an *improper basis* as identified in common law court decisions, legislation, or regulations. A discharge based upon a violation of public policy is vulnerable to attack in a judicial setting, and allegations of "retaliation" and "pretext" give cause for a closer look.

I reiterate—I join in the reversal of summary judgment in order to permit Ms. Carl to prove, if she can, that she was fired in retaliation for her testimony before the City Council and that the alleged reasons asserted for that discharge were in fact pretextual.[4]

### APPENDIX

MACK, Senior Judge, dissenting [in *Carl I* ]:

I would consider the merits of appellant's allegation that she had been discharged by appellee in violation of public policy. I would remind my colleagues first as to the law and the facts. We are all in agreement today that, in reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, we accept the plaintiff's allegations as true; it necessarily follows that we are considering whether Ms. Carl can be lawfully fired because she testified before the Council of the District of Columbia and appeared in District of Columbia Courts as an expert witness for plaintiffs in medical malpractice cases.

Further, I would remind my colleagues of the issues, the first being, may this court judicially recognize an exception to the employment-at-will doctrine? The obvious answer is "yes" since we already have done so. *See Adams v. George W. Cochran & Co.,* 597 A.2d 28, 32 (D.C.1991) (finding that an employee was wrongfully discharged when the employee refused to violate the law). I depart from my colleagues in responding to a second issue: are we free as a panel to consider the allegations of wrongful dis-

---

4. As to the final claim of Ms. Carl that she was wrongfully discharged for providing expert advice on behalf of plaintiffs in medical malpractice cases in contravention of the integrity of the judicial process, *see* APPENDIX, *infra,* at 195–196.

charge which we must accept as true? Of course we are.

As to my colleagues' reliance on our vacated and reinstated panel decision in *Gray v. Citizens Bank of Washington,* 602 A.2d 1096–97, *opinion reinstated on denial of reh'g,* 609 A.2d 1143 (D.C.1992), I view the language, that only the *en banc* court can extend an exception to the at-will doctrine, as the pronouncement of *only one member of this court.*[1] Even were this not so, this conclusion would not, could not, pass muster. It is contrary to the very essence of the common law as an evolving component of legal development and reasoning. A panel of our court cannot "legislate" to conclude that only our court *en banc* can expand or limit a common-law doctrine. Legal precedent is vital to the court system; however, it stands to reason that no panel of this court is in a posture to bind all future panels on future cases with very different facts and circumstances. Such broad *dicta* is beyond a panel's power and is suspect as precedent. I would ignore the *dicta,* pronounced in one of the three opinions of the panel[2] in *Gray,* and rule on the merits in this case. I would conclude that firing someone for testifying before the City Council on tort reform violates a clear mandate of public policy and therefore would create another limited wrongful discharge cause of action as an exception to the employment-at-will doctrine. I would remand for further consideration the question of whether discharging an employee for testifying as an expert in medical malpractice cases violates a clear mandate of public policy. Under either cause of action, appellant could have the opportunity of attempting to show that the termination was retaliatory and a defense pretextual.

**I.**

Today the majority states that "In *Gray,* we held that 'only the *en banc* court may undertake the extension that appellant urges on us.' Therefore, we must affirm the trial court because 'a division of th[is] court is not free to expand the *Adams* exception....'" Majority op. at 159. In my view, both the lead opinion in *Gray* and today's decision cannot operate to bind all future panels of this court from deciding the merits of expanding the public policy exceptions to the employment-at-will doctrine. Not only are these opinions out of line with our prior precedent in this area of law, but both courts are out of bounds with historical precedent and the development of the common law.

The employment-at-will doctrine is judicially imposed and was created by default from the evolution of the common law. As we have stated "a contract for employment of indeterminable length and where there is *no statute to the contrary,* the contract is terminable by either employer or employee at will without liability to the other party." *Lyons v. Capital Transit Co.,* 62 A.2d 312 (D.C.Mun.1948); *see also Pfeffer v. Ernst,* 82 A.2d 763, 764 (D.C.Mun.1951). As a judicially created and imposed doctrine the courts should be free to modify the doctrine as the development of the common law would necessitate. As one court has stated:

> While it is the function of courts to interpret rather than make the law, it must nevertheless be borne in mind that the common law is not a collection of archaic, abstract legal principles ...—it is a living system of law that, like the skin of a child, grows and develops as the customs, practices and necessities of the people it was adopted for change. The common law

1. In *Gray,* one member of the panel (concurring in affirmance of the trial court's dismissal of a complaint) agreed it would be "more seemly" to act *en banc,* 602 A.2d at 1099; another, relying on the specific factual allegations in that case, concluded that it was anything but a "suitable vehicle" for *en banc* consideration. *Id.* at 1100–02.

2. In *Gray,* a petition for rehearing *en banc* was heard, and the panel decisions were vacated. 609 A.2d 1143. A majority *en banc* vote, reinstating the panel's decision, is silent as to why a

petition for rehearing was "improvidently granted." Three dissenting judges stressed the importance of the public policy exception sought in the facts of that case.

In the instant case, Ms. Carl sought an initial rehearing *en banc.* Appellee points to a purported "concession" by Ms. Carl that if that rehearing was denied, it would be "inappropriate" for a panel to expand the law of wrongful discharge— a position which is antipathetic to the appellate process.

had its genesis in the customs and practices of the people, and its genius, as many of the country's greatest jurists and legal scholars have pointed out, is not only its age and continuity, but its vitality and adaptability.

*Sides v. Duke University,* 74 N.C.App. 331, 328 S.E.2d 818, 827, *review denied,* 314 N.C. 331, 333 S.E.2d 490 (1985).

This court has never before stated that a common law doctrine cannot be modified, expanded or contracted without *en banc* consideration. In fact three-judge panels of this court have often over time modified, expanded or contracted common law doctrines in the area of torts and contracts. *See, e.g., District of Columbia v. Owens–Corning Fiberglas Corp.,* 572 A.2d 394, 403–05 (D.C.1989) (recognizing municipal immunity from the running of statutes of limitations and repose because of "the artifact of a royal prerogative"); *Rong Yao Zhou v. Jennifer Mall Restaurant,* 534 A.2d 1268, 1276 (D.C.1987) (holding that a violation of the D.C.Code § 25–121(b) by serving a person already intoxicated "renders the tavern keeper negligent *per se* "); *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1357 (D.C.1978) (accepting "that the law of products liability applies not only to the sale of goods, but also to the sale of newly constructed homes"); *Matthews v. District of Columbia,* 387 A.2d 731, 734 (D.C.1978) (adopting the "recognized common law duty owed to prisoners by penal authorities is one of reasonable care in their protection and safekeeping"); *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 289 (D.C.1977) (recognizing the tort of interference with prospective advantage); *Gaither v. District of Columbia,* 333 A.2d 57, 60 (D.C.1975) (recognizing "that there is a common law duty owed to the prisoner, by his guards and their superiors, which requires that they exercise reasonable care in the protection and safekeeping of the prisoner"); *Cottom v. McGuire Funeral Serv., Inc.,* 262 A.2d 807, 809 (D.C.1970) (expanding products liability for a defective product to include recovery by a nonpurchaser against the wholesaler).

The employment-at-will doctrine should be no exception to the power of each panel of this court to do justice within the confines of precedent and legal reasoning. Prior to today, no other three-judge panel has failed to at least implicitly address the merits of expanding or creating a public policy exception to the employment-at-will doctrine. *See, e.g., Elliott v. Healthcare Corp.,* 629 A.2d 6, 8–9 (D.C.1993) (rejecting expansion of public policy exception to employment-at-will doctrine); *Nolting v. National Capital Group, Inc.,* 621 A.2d 1387 (D.C.1993) (same); *Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 269 (D.C.1993) (same); *Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.,* 565 A.2d 285 (D.C.1989) (same). Three of these cases were decided after *Gray* and do not suggest that a panel is prohibited from recognizing a public policy exception; each rather rejects the need for an expansion on the facts of each case. In fact, the only exception to the employment-at-will doctrine in this jurisdiction was adopted by an opinion of a three-judge panel, not the court *en banc. Adams, supra* (recognizing an exception for at-will employment doctrine when employee refuses to violate the law).

**II.**

In *Adams* this court recognized a tort for wrongful termination under a very limited public policy exception to the at-will employment doctrine when an employee is discharged for refusing to violate a statute. 597 A.2d at 32. Although this court has not further defined or modified the types of situations covered by the limited public policy exception, other jurisdictions have defined the types of situations covered by a more expansive public policy exception. In fact, a majority of jurisdictions permit suits for retaliatory discharge when the discharge violates a clear mandate of public policy as expressed in the jurisdiction's constitution, judicial decisions, statutes and regulations. *See Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 106–07 & n. 3 (Colo.1992) (noting thirty-seven jurisdictions with a public policy exception to the at-will employment doctrine).

The rationale for allowing a cause of action for wrongful discharge has been explained as follows:

> [I]n a civilized state where reciprocal legal rights and duties abound the words "at will" can never mean "without limit or qualification," ... for in such a state the rights of each person are necessarily and inherently limited by the rights of others and the interests of the public. An at will prerogative without limits could be suffered only in an anarchy, and there not for long—it certainly cannot be suffered in a society such as ours without weakening the bond of counter balancing rights and obligations that holds such societies together. Thus, while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy.

*Sides, supra,* 328 S.E.2d at 826.

" 'Public policy' is that principle of law which holds that no one can lawfully do that which tends to be injurious to the public or against the public good." *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 871 (Mo.Ct. App.1985). The sources of public policy "include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980).

Among the public policy exceptions recognized by courts that allow an employee to sue for retaliatory discharge include: (1) jury duty, *e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975); (2) whistle blowing or threatened reporting of a statutory violation, *e.g., Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980); *Boyle, supra; McQuary v. Bel Air Convalescent Home, Inc.,* 69 Or.App. 107, 684 P.2d 21 (1984); (3) cooperating with a law enforcement investigation, *e.g., Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill. Dec. 13, 421 N.E.2d 876 (1981); *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 575 N.E.2d 1107 (1991); (4) exercising a statutory right or privilege such as filing a worker's compensation claim, *e.g., Niesent v. Homestake Mining Co.,* 505 N.W.2d 781 (S.D.1993); (5) exercising a constitutional or political right such as refusing to participate in employer's lobbying effort and privately stating opposition to company's political stand or running for political office, *e.g., Novosel v. Nationwide Ins. Co.,* 721 F.2d 894 (3d Cir.1983); *Davis v. Louisiana Computing Corp.,* 394 So.2d 678 (La.Ct.App.), *writ denied,* 400 So.2d 668 (La.1981); (6) acting consistently with a professional code of ethics, *e.g., Pierce, supra; Kalman v. Grand Union Co.,* 183 N.J.Super. 153, 443 A.2d 728 (App.Div.1982); (7) being fired because of race or gender, *e.g., Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328 (1994); (8) refusing to testify falsely at a trial or administrative hearing, *e.g., Sides, supra;* and (9) refusing to violate a law, *e.g., Adams, supra; D'Agostino v. Johnson & Johnson, Inc.,* 133 N.J. 516, 628 A.2d 305 (1993). Thus, many courts have recognized a more expansive exception to the rule of employment-at-will than this court did in *Adams* based on a broad public policy exception.

In adopting a cause of action for wrongful discharge based on a clear mandate of public policy courts should:

> [B]alance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

*Pierce, supra,* 417 A.2d at 511. I would follow the majority of jurisdictions in this country and recognize a general action for wrongful discharge when contrary to a clear mandate of public policy.

Here Carl claims she was discharged because she testified before the City Council on tort reform issues contrary to the interests of her employer and because she testified for plaintiffs in medical malpractice cases. Carl

raises three public policies that her discharge contravened:

(1) a citizen's right to engage in political expression before the D.C. City Council without fear of harassment or intimidation; (2) a professional nurse's duty to participate in the legislative process, to advocate positions of public importance on behalf of patients and to educate the legislature so that it can make informed public policy decisions; and (3) the judicially-created evidentiary rule requiring expert testimony to establish a *prima facie* case of negligence in a medical malpractice action.

### A.

Specifically Carl points to D.C.Code § 1–224 (1981) which states that

Whoever, corruptly or by threat or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness in any proceeding pending before the Council ... shall be fined not more than $2,000 or imprisoned not more than 2 years, or both.

Clearly, the Council has expressed a desire that all citizens be free to exercise their right to participate in the legislative process without obstruction or intimidation. A fully informed legislative process is vital to the creation of sound public policy consistent with the public interest. D.C.Code § 1–224 makes it a crime to try to intimidate a witness. Dismissing a witness from employment because of such testimony will have a deterrent effect on potential future witnesses. Allowing someone to be fired for helping to inform the legislative process is contrary to the clear mandate of public policy implicitly recognized in D.C.Code § 1–124.

In *Bishop v. Federal Intermediate Credit Bank of Wichita*, 908 F.2d 658 (10th Cir. 1990), the court allowed a suit when the plaintiff alleged discharge from employment for testifying before a congressional committee. The court supported the public policy exception on a state statute affording witness immunity from future criminal prosecution for legislative testimony:

Recognition of the exception supports our tradition of free, direct and truthful testimony at legislative hearings, a policy Oklahoma has implicitly recognized. *Cf.* Okl. Stat. Ann. title 12, § 411 (1988) ("No testimony given by a witness ... before any committee ... shall be used as evidence in any criminal proceeding against him in any court...."). Presumably, Oklahoma would extend the same protections out of comity to hearings conducted under congressional authority. Accordingly, we hold that truthful testimony at congressional hearings is "an act consistent with a clear and compelling public policy" that justifies a public policy exception to the at-will employment doctrine.

*Id.* at 662–63.

The Oklahoma statute in *Bishop* granted criminal immunity to a witness. Here, D.C.Code § 1–124 makes it a crime to intimidate a witness. Employees should not be forced to choose between losing their jobs or engaging in the political right and public policy necessity of providing the legislature with important information regarding their legislative responsibilities. The public's need for an informed legislative process not subject to influence, intimidation or any other impediment is a vital public policy. Dismissing an employee for testifying before the legislature clearly impedes future testimony. Here we have even a stronger indication of public policy than the court had in *Bishop* under the Oklahoma statute.

Carl also asserts that one of the obligations of a professional nurse is as an advocate on issues of public health. Included in this obligation is public education and in this case political expression in the form of educating the City Council on a matter of medical importance—tort reform and medical care. Carl points to the Health Occupations Act, D.C.Code § 2–3301.2(17)(C), and the national nursing code of conduct, American Nurses Association, *Code for Nurses with Interpretative Statements* § 11.2 (1985), as revealing a public policy that nurses express their views and participate in the political process on issues regarding public health.

Specifically, the Health Occupations Act defines the "practice of registered nursing"

as the "performance of services, counseling, and education for the safety, comfort, personal hygiene and protection of patients, the prevention of disease and injury, and the promotion of health in individuals, families and communities." D.C.Code § 2–3301.2(17)(C). Thus, there is some statutory support for the assertion that nurses should promote public health by educating the community. Other jurisdictions have grounded public policy exceptions to at-will employment on similar state health and nursing statutes. *See Kirk v. Mercy Hosp. Tri-County*, 851 S.W.2d 617, 620–23 (Mo.Ct.App. 1993) (recognizing wrongful discharge claim by nurse who reported improper treatment of patient based on public policy in nursing law); *Winkelman v. Beloit Memorial Hosp.*, 168 Wis.2d 12, 483 N.W.2d 211 (1992) (allowing wrongful discharge suit when nurse refused to be reassigned to area of hospital she felt she was not qualified for when administrative rule states a nurse should not perform services she is not qualified for by education, training or experience).

Carl also relies upon the American Nurses Association, *Code for Nurses with Interpretive Statements* § 11.2, which directs nurses to promote "the welfare and safety of all people" through "active participation in decision making in institutional and political arenas." Other courts have concluded that codes of professional conduct are a source of public policy in the wrongful discharge context when the ethical code provision serves the public interest as opposed to the interest of the professional. *See Pierce, supra,* 417 A.2d at 512 (recognizing possible public policy interest arising from medical Hippocratic oath or other codes of professional ethics); *Kalman, supra,* 443 A.2d at 730–31 (recognizing wrongful discharge cause of action based on pharmaceutical code of ethics).

Both the Health Occupations Act and the *Nurses Code* provide a strong policy that nurses should inform and educate the public and legislative process in regards to matters of public health. Tort reform legislation presumably would have an impact (positive or negative) on public health. The requirement in the *Nurses Code* is not designed to serve only in the interests of the profession, but rather is designed to educate the public—a clear interest of the public. In addition, the Health Occupations Act clearly wants health officials to educate the public on matters of public health. Testifying before the legislature or City Council is one of the best ways to educate the public regarding matters of public health. Therefore, both the health statute and the code of professional ethics provide a sufficient grounding for pursuing a wrongful discharge claim based on a clear mandate of public policy.

Unencumbered expert testimony before the City Council on a matter of public importance, such as tort reform, is of vital importance to our democratic process and informed decision making by our elected officials. Retaliatory discharge for speaking on issues of public health and safety should not be impeded by an employer especially when a professional feels obligated to voice an opinion on matters within his or her expertise and experience and when legislative statutes and a professional code of ethics encourage the professional to inform and educate the public on such matters. A retaliatory firing for testifying as a professional nurse on tort reform is contrary to the polices articulated in D.C.Code § 1–124, the Health Occupations Act and the *Nurses Code.* These statutes and ethical code create a clear mandate of public policy for informed expert medical testimony before a legislature on matters of public health not subject to influence, intimidation or any other impediment. Therefore, I would recognize an exception to the employment-at-will doctrine based on this clear mandate of public policy.[3]

---

**3.** There is also some basis to find an exception to the employment-at-will doctrine on public policy grounds from the First Amendment right to free expression. *See Novosel, supra,* 721 F.2d at 898–900 (finding dismissal of employee based on refusal to participate in political lobbying on behalf of employer a violation of First Amendment values); *Lenzer v. Flaherty,* 106 N.C.App. 496, 418 S.E.2d 276, 287 (recognizing public policy exception based on free speech guarantees when a physician's aide reported patient abuse), *review and supersedeas denied,* 332 N.C. 345, 421 S.E.2d 348 (1992); *Schultz v. Industrial Coils Inc.,* 125 Wis.2d 520, 373 N.W.2d 74, 76 (App.1985) (designing balancing test based on free speech claim

## B.

Carl also asserts that she was discharged for providing expert advice and testimony on behalf of plaintiffs in medical malpractice cases. Thus, she argues that her discharge contravenes a judicial rule and the integrity of the judicial process. Our decisions require that a plaintiff present expert testimony to establish the applicable standard of care in a medical malpractice case where the medical procedure is beyond the ken of the average layman. *Eibl v. Kogan,* 494 A.2d 640, 642 (D.C.1985) (per curiam). Judicial opinions are a recognized source of public policy in the employment-at-will context. As one court has noted sole reliance on legislative pronouncements would "eliminate aspects of the public interest which deserve protection but have limited access to the political process." *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1043 (Utah 1989).

In *L'Orange v. Medical Protective Co.,* 394 F.2d 57 (6th Cir.1968), the court was confronted with the issue of whether a dentist could lose his malpractice insurance for testifying for a plaintiff in a malpractice suit against another dentist. The two dentists resided in the same city and had the same malpractice insurance carrier. The terms of the insurance contract had a cancellation clause that was almost equivalent to an at-will employment situation—the insurance could be cancelled upon ten days notice for any reasons as long as the unearned premium was returned. However, the court noted that Ohio courts have determined that an insurance policy is a voluntary contract "subject to the public policy of the state." *Id.* at 59. Thus, the court had to define public policy in a professional testimony case.

The *L'Orange* court discussed the public policy of medical expert testimony as follows:

> The virtual necessity of expert testimony in medical malpractice cases plus the recognized reluctance of members of the medical profession to give such testimony render the public policy against intimidating a witness even more compelling in the present case.

It cannot be doubted that the effective administration of justice requires that expert testimony be available in malpractice actions.

\* \* \* \* \*

> A member of the medical profession could hardly be expected to appear in court and testify for a plaintiff in any litigation if the penalty might be the cancellation of his own malpractice insurance. It manifestly is contrary to public policy to permit an insurance company to use policy cancellation as punishment against a doctor or dentist who appears as a witness to protect the rights of a plaintiff who has been wronged by another member of the profession. If the insurance industry can use the cancellation procedure to keep members of the medical profession from testifying as witnesses, malpractice litigation can be stifled.

*Id.* at 61–62 (citations and footnotes omitted). This same public policy analysis would seem applicable in the retaliatory discharge context.

A medical professional should not be intimidated from testifying in court cases by fear of being fired by his or her employer. Experts do help with the administration of justice and in allowing individuals to recover for tortious conduct. With more and more medical professionals being employed by large corporations, health maintenance organizations, and hospitals, an employer or group of employers could effectively intimidate a medical professional from testifying for a plaintiff by threatening dismissal.

However, experts are hired and paid for testifying by plaintiffs, defendants, or their counsel. Testifying in a tort case is not a whistleblowing activity or an activity designed to educate the public regarding public health. If a professional is required to be in court under a subpoena, public policy would dictate that he or she not be fired for speaking the truth, or for refusing to alter truthful testimony regarding his or her involvement while on duty. *See Sides, supra* (finding wrongful discharge cause of action when

in wrongful discharge case when employee wrote

letter to local newspaper criticizing employer).

nurse discharged for refusing to testify falsely or incompletely at medical malpractice trial). However, where the professional is hired to testify against his or her employer, as opposed to another entity, no judicially-created evidentiary requirement on expert testimony creates a clear mandate of public policy in the wrongful discharge context.

The record in this case is unclear on the specific nature of the testimony, its involvement with Children's Hospital, or other hospitals, and its production for payment or under subpoena. On remand these factors would be critical on whether there is a cause of action for retaliatory discharge based on a clear mandate of public policy. Thus if Carl testified under subpoena she would be immunized against retaliation for truthful testimony regardless of whether the testimony was against the interest of Children's Hospital or some other medical entity. However, if Carl was hired to testify by a party other than her employer, any testimony against the direct interest of Children's Hospital might place her beyond protection. Such a determination would likely turn on whether the suit was against Children's Hospital or another entity. Therefore, I would remand this aspect of the case for further discovery of the circumstances of her testimony in the medical malpractice cases.

### III.

In conclusion, I gather that we can all agree that the employment-at-will doctrine protects the interest of both the employer and the employee. The right of termination is mutual to both; discharge is not so mutual.[4] To prevent a shocking discharge in derogation of public policy, either statutorily or judicially-imposed exceptions have evolved. The adjectives "retaliatory" and "pretextual," as applied to a discharge, cry out for a resolution when an employee has done nothing more than to perform a public service—a

service protected against interference by a criminal statute. I would reverse summary judgment on the wrongful discharge claim to permit Ms. Carl to prove, if she can, that she was fired for testifying before the Council or under immunized circumstances for testifying as a plaintiff's expert, at which time presumably appellee could defend its position that she was terminated for legitimate reasons.[5]

STEADMAN, Associate Judge, with whom KING, Associate Judge, joins, dissenting:

Prior to today, the law in this jurisdiction relating to the termination of employment of at-will employees was clear and certain. An employer could discharge an at-will employee at any time for any reason or for no reason at all, so long as the reason was not the employee's refusal to violate the law, *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30–33 (D.C.1991), or some other statutorily proscribed reason such as attending jury service, D.C.Code § 11–1913 (1995), seeking workers compensation, D.C.Code § 36–342 (1997), or on account of the employee's race, sex or other protected status, D.C.Code § 1–2512 (1992).

I do not believe that our jurisprudence is well served by the en banc court acknowledging the existence of an area of further potential limitations resting on the ill-defined rubric of public policy, whose imprecise contours will be ruled on in the future by numerous and disparate trial courts and appellate panels. Such uncertainty can only plague the countless numbers of employers, employees, and their attorneys seeking to assess the precise legal status of the at-will-employment relationship. Rather, I would follow the approach of the New York Court of Appeals and require those advocating such expansion to address their efforts to the body that is, in my view, manifestly better positioned to make such determinations. *See Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89

---

4. I notice that the word "termination" is used by my colleagues in advancing the Hospital's version of the facts; "fired" is used to describe the allegations of Ms. Carl's complaint, which the majority concedes it must accept as true.

5. As to the issue of the denial of discovery, I agree with my colleagues that we have jurisdiction to review the trial court's denial of the motion to compel. I am not so sanguine as to say that I agree with their holding with respect thereto (in view of the limited discovery sought as well as its relevancy to retaliation charge).

(1983) (refusing to recognize tort of wrongful discharge of at-will employee and noting that "perception and declaration of relevant public policy ... are best and more appropriately explored and resolved by the legislative branch of our government"); *Wieder v. Skala,* 80 N.Y.2d 628, 593 N.Y.S.2d 752, 757, 609 N.E.2d 105, 110 (1992) (noting that "we have consistently held that [such a] significant alteration of employment relationships ... is best left to the legislature").[1]

I can see at least three principal advantages to requiring that public policy exceptions to the at-will-employment doctrine be fashioned exclusively by the legislature. First, the legislature is the proper organ of government to make and define the scope of public policy. As a democratically elected body it is uniquely beholden to the concerns of the employers and employees of the District in a way we are not, and it has the power to hold hearings and conduct inquiry into a broad range of collateral issues and competing concerns that we do not. This is particularly the case where what is at issue is not a refusal by the courts to enforce some socially unacceptable contractual provision, *see* RESTATEMENT (SECOND) OF CONTRACTS § 178 (1981), but rather the creation of a hitherto nonexistent basis for an affirmative cause of action in tort.

Second, of equal if not greater importance, public policy exceptions fashioned by the legislature have the benefit of providing clear notice to employers and employees prior to the accrual of a cause of action. The parties know where they stand and what they can and cannot do because the duty of employers is written into the law. In contrast, public policy exceptions formulated by courts are derived and applied *post hoc,* and provide no clear guidance to employers considering a possibly unlawful discharge. As it has been noted, "jurists to this day have been unable to fashion a truly workable definition of public policy," *Maryland–Nat'l Capital Park*

*and Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 386 A.2d 1216, 1228 (1978).

Third, the nature and extent of the remedy provided by legislatively enacted public policy exceptions can be tailored to fit the harm in accordance with existing statutes in a way we cannot. Our legislative body knows full well how to circumscribe with precision the discharge of at-will employees. For example, the Council has determined that where an employee has been discharged for seeking workers compensation benefits, an administrative claim for reinstatement and back pay is the appropriate remedy, *Nolting v. National Capital Group, Inc.,* 621 A.2d 1387, 1388 (D.C.1993); while where an employee has been discharged for attending jury duty, a judicial cause of action for reinstatement, back pay, compensatory damages and attorney's fees is the appropriate remedy, D.C.Code § 11–1913(c) (1995); and where an employee has been discharged for a discriminatory purpose, the employee's choice of either an administrative claim for reinstatement, back pay, compensatory damages, attorney's fees and injunctive relief or a judicial cause of action for reinstatement, back pay, compensatory damages, attorney's fees and punitive damages is the appropriate remedy, *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 370–72 (D.C.1993); D.C.Code § 1–2553(a) (1992).

Judge Terry has made an heroic effort to appropriately cabin the role of the courts in creating further public policy limitations to the employment-at-will doctrine. Nonetheless, for the foregoing reasons, I must register my dissent.[2]

---

1. *See also Salter v. Alfa Ins. Co.,* 561 So.2d 1050, 1052 (Ala.1990) (rejecting public policy exception to employment-at-will doctrine because "[s]uch creations are best left to the legislature"); *Gil v. Metal Serv. Corp.,* 412 So.2d 706, 708 (La.Ct.App.1982) (same).

2. If my position were adopted and some unforeseen circumstance should arise involving manifest injustice and a gross affront to public policy, the en banc court would always be available to reexamine the law. However, today's disposition leaves such determinations open to future divisions of this court; if put to a choice between

the standard to determine future public policy exceptions contained in part I(B) of Judge Terry's opinion and those of the other concurring opinions, I and Judge King would vote for the former. Therefore, in our judgment, the standard set forth by Judge Terry, which is endorsed by the four judges approving it and which is acquiesced in by Judge King and myself, can be said to be the effective holding of the en banc court on that issue.